No. 15,501.

WILSON *v.* ROSS INVESTMENT COMPANY ET AL.
(180 P. [2d] 226)

Decided April 14, 1947.

Mr. HORACE N. HAWKINS, Mr. F. E. DICKERSON, Mr. A. F. ZARLENGO, for plaintiff in error.

Messrs. BANCROFT, BLOOD & LAWS, Mr. HAROLD D. TORGAN, for defendants in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

THIS case involves a commission for the sale of real estate. We will refer to the parties as they appeared in the trial court, where plaintiff in error was defendant, and defendants in error were plaintiffs.

The two real-estate firms, as plaintiffs, recovered judgment against defendant in a trial to a jury in the amount of $7,575 as real-estate commission on a transfer from defendant to the United States Government of 1430 acres, more or less, of land west of the City and County of Denver. This site, immediately upon being taken over by the government, became the location of an ordnance plant for the duration of the war.

The case differs from the ordinary suit for broker's or agent's commission, in that before a sale had been consummated the federal government brought condemnation proceedings in respect to a portion of the acreage that previously had been optioned, and the landowner, after personally conducting negotiations with officials of the government for about a year and a half, finally agreed to settle in the condemnation suit for less per acre than the amount for which she had originally agreed to sell. The amount of commission awarded to plaintiffs, $7,575, represented five per cent of $151,500,

the amount defendant received from the federal government in settlement under the condemnation proceedings.

In their original complaint, plaintiffs sought recovery on quantum meruit for the value of their services performed at the instance of the defendant. In an amendment to the complaint they added the alternative cause of action for recovery under express contract of a real-estate commission for procuring a purchaser for defendant's property. Just before the case was submitted to the jury, upon motion of defendant, the plaintiffs were required to elect upon which of their two causes they would stand. They elected to stand upon that of quantum meruit.

The evidence showed that Cyrus A. Hackstaff, of the Frederick R. Ross Investment Co., was called to a meeting at the Brown Palace Hotel on the evening of December 12, 1940, at which quite a large number of officials—army officers, railroad men, and others, including J. L. Warner of the real estate division of E. I. duPont de Nemours & Company—were present. He testified, "I was shown a map and told that I could not be told that evening what the purpose—what purpose I was to try to procure a site for, but I was shown a map which set out about fourteen hundred acres that they thought they might need. I was instructed to obtain an option that night by the men at the Brown Palace Hotel." He was told that his commission or remuneration would have to be from the landowner and not from any possible purchasers who might exercise the option. Thereupon he got in touch with Mr. Conway, of the Conway-Bogue Realty Investment Company, who had a "for sale" sign on defendant's property, and the two of them immediately interviewed defendant and her son, resulting in the execution of an option by defendant, under date of December 13, 1940, running to J. L. Warner covering 1440 acres of land for $175,000.

This option was subsequently cancelled, and a new one, dated December 16, 1940, was signed by defendant

giving J. L. Warner, or his assigns, an option to buy "3068 acres more or less." This second option contained a provision that it "shall include 75 inches of water in the Agricultural Ditch and Reservoir Company, and 135 inches of water in the Welch ditch. All mineral and oil rights to be included." The option price was $207,450. By its terms Warner and his associates were permitted to go upon the land for the purpose of making surveys and water tests, and an acceptance was required on or before February 1, 1941. This option also contained a schedule describing nine separate parcels of land containing in all 1,648 acres of the total acreage of 3,068 acres. The schedule showed the number of acres in each parcel, and a separate valuation per acre was placed on each parcel, as well as a total dollar valuation, and contained a provision that, "After a survey of the land above described reveals that certain portions thereof are not required by J. L. Warner or his assigns at his option, all or any of the following described parcels of land may be dropped from the terms of this option and the total consideration hereinbefore designated shall be reduced by the sum of the amounts hereunder set forth opposite the respective parcels not required, other terms and conditions to remain the same."

A third option, executed on the printed form of The Frederick R. Ross Investment Company, was executed by the landowner under date of December 20, 1940, whereby she agreed to sell and convey to that company on or before March 1, 1941, approximately 68 acres additional land, not included in the second option. This option included 45 inches of water in the Agricultural Ditch and Reservoir Company. The option price was $27,200, less the $100 paid down upon the giving of same. In the option there was recited an agreement to pay five per cent commission for making the sale. December 21, 1490, this option was assigned to J. L. Warner, excepting commission.

A fourth option, dated January 16, 1941, in consideration of $100, granted to J. L. Warner, or his assigns, the right until March 1, 1941, to purchase an additional 160 acres, together with 110 inches of water in the Agricultural Ditch and Reservoir Company, for the sum of $44,000. This option also extended the second option, Exhibit A, until March 1, 1941, and contains the following condition: "It is specifically understood and agreed that this option cannot be exercised unless the minimum requirements under the terms of those options previously given by St. Claire Okie Hayden are exercised, one of which is dated December 16, 1940 * * * and the other dated December 20, 1940 * * *."

February 16, 1941, contractors, under directions from the federal government, went into possession of defendant's property. Ten days later, February 26, condemnation proceedings were instituted in the Federal District Court in Denver by the United States Government. The property taken under the condemnation proceedings did not conform either in amount of acreage, water rights, or in respect to price, with the minimum requirements described under the options—the principal deviation being that the condemnation proceedings, although including a reservoir site on the land condemned, did not include the water rights, and neither was the land in a certain section 17 included in the property condemned.

The testimony of both Messrs. Conway and Hackstaff went to the effect that they were instrumental in interesting the federal government in the property of defendant; that the government was considering other sites, such as one near Littleton which had the advantage of propinquity to a railroad, another nearer Golden, and a third east of Denver, but that through their efforts the interest of the government was finally directed toward defendant's property for the location of a small-arms plant. Both gentlemen disclaimed any knowledge of the plans leading to the bringing of condemnation proceedings, although Hackstaff testified that he had

been informed in February that the government was interested in assembling lands for condemnation.

When the land was first occupied under the condemnation proceedings, defendant was in Florida. Her son, on his own accord, consulted a Denver attorney and had a conference with him and Mr. Hackstaff in which, the latter testified, they urged him to continue to assist defendant in the condemnation proceedings. Plaintiffs at about this time offered to work for defendant on a sliding scale, beginning at three per cent and proceeding up to twenty per cent, the rate depending upon the amount that defendant should ultimately receive in the condemnation suit. Defendant subsequently rejected this offer, and, as already noted, after a year and a half of negotiations, settled with the government on the terms already stated. Defendant claims that the government by its condemnation proceedings "took the cream and left the scum" of the property. Plaintiffs, although minimizing this expression as an exaggeration, do not claim that they fulfilled any or all of the option contracts.

Mr. Hackstaff's testimony covered the details surrounding the execution of the four option contracts signed by the landowner and described his endeavors to convince the landowner that she would not be able to sell the property unless she reduced her prices; how they agreed to cancel the first option at the time of the execution of the second; how, after executing the second option, the landowner called him the following morning and told him she had not been able to sleep all night, that she thought she had signed an option at too low a price, and that she thought she should change the price to a higher one; that after a conference he persuaded her to allow the option to stand as written. He told of her being motivated by a desire to sell, and at the same time to get a good price for her property. He identified a letter which he received from Mr. J. L. Warner, under date of January 24, 1941, and after he had obtained the four

options from the landowner, the following paragraphs of which were admitted in evidence:

"Enclosed is my personal check for one hundred dollars, #5973, Wilmington Trust Company, as reimbursement for option payment made to Mrs. Hayden for option on the west one-half of Section #10.

"We sincerely appreciate your cooperation and wish to commend you for the very capable manner in which you handled the securing of the options for the proposed ammunition plant at Denver. We consider the price of the land reasonable and the site excellent for our purpose.

"We were also very pleased with the cooperation which Mrs. Hayden gave us and wish you to express our appreciation to her."

There is no indication from Mr. Hackstaff's testimony that the landowner agreed to sell her property under any arrangement other than that contained in the written options which he had obtained from her over a month's period of negotiations. Mr. Conway, in his testimony, admitted that the landowner had made no agreements other than those contained in the four written options. He laid great emphasis on the fact that in his experience the great majority of deals that were closed after options had been taken were not closed on the basis of the original options, but were subsequently "negotiated," meaning that there were modifications from the original terms of the options. In his view, the modifications that the condemnation proceedings had brought about from the terms of the original options were similar to modifications that might occur in the final negotiation of any transaction. And counsel for the brokers state their position succinctly when, in arguing the point as to whether the brokers had rendered services entitling them to a commission, they say that "condemnation was performance." At no time was the possibility of condemnation mentioned to the landowner. In fact, both Messrs. Hackstaff and Conway disclaimed

any knowledge of any condemnation proceedings until the matter became known to all of the parties, when the contractors moved onto the land.

This case, therefore, presents a clear-cut issue of whether the unexpected condemnation by the government of some of the property, which had been the subject of negotiation between brokers and landowner for alleged sale to the government, operates as a sale so as to entitle the brokers to a commission when the land so taken in condemnation varies in both price and acreage from the provisions of written option contracts previously executed by the landowner at the instance of the brokers. Plaintiffs answer this question in the affirmative. On the other hand, one of the landowner's specification of points is, that condemnation is not a sale— that the condemnation proceedings operated to prevent the sale that was contemplated by the parties to this suit.

Under the federal statutes and decisions, a distinction appears to be made between purchase and condemnation. As Mr. Justice Strong, in *Kohl v. United States,* 91 U.S. 367, 374, said: "It is true, the words 'to purchase' might be construed as including the power to acquire by condemnation; for, technically, purchase includes all modes of acquisition other than that of descent. But generally, in statutes as in common use, the word is employed in a sense not technical, only as meaning acquisition by contract between the parties, without governmental interference. That Congress intended more than this is evident, however, in view of the subsequent and amendatory act passed June 10, 1872, which made an appropriation 'for the purchase at private sale or by condemnation of the ground for a site' for the building."

In *Garrison v. City of New York,* 21 Wallace, 88 U.S. 196, 203, the court had under consideration a New York state act relating to condemnation proceedings involving the widening and straightening of Broadway in New

York City. The constitutional objection had been raised that there was an impairment of the obligation of contract under the federal Constitution, Art. I, §10. Speaking to this point, the court said: "There is, therefore, no case presented in which it can be justly contended that a contract has been impaired. It may be doubted whether a judgment not founded upon an agreement, express or implied, is a contract within the meaning of the constitutional prohibition. * * * But it is not perceived how this fiction can convert the result of a proceeding, not founded upon an agreement express or implied but upon a transaction wanting the assent of the parties, into a contract within the meaning of the clause of the Federal Constitution which forbids any legislation impairing its obligation. * * * In the proceeding to condemn the property of the plaintiff for a public street, there was nothing in the nature of a contract between him and the city. The state, in virtue of her right of eminent domain, had authorized the city to take his property for a public purpose, upon making to him just compensation."

On the other hand "a sale" means "a contract between parties to give and to pass rights of property for money which the buyer pays or promises to pay the seller for the thing bought or sold." 55 C.J. 36.

The federal law passed during the war emergency, Title 50 U.S.C.A., section 171, likewise recognizes a distinction between condemnation and purchase when it specifies three methods of acquiring title, namely: condemnation, purchase and donation.

The apparent contradiction to this distinction in *Hawaiian Gas Products v. Commissioner* (9th C.C.A.), 126 F. (2d) 4, is largely dispelled when it is realized that that was a case under the federal income tax law involving capital gain resulting from condemnation. We do not believe that that case has changed the basic difference between a condemnation proceeding and a sale. The court merely holds that for the purpose of taxing a

capital gain or loss, compensation received from property taken under condemnation proceedings establishes either a gain or loss for tax purposes in the same way as would proceeds from a sale.

Another case in which the word "sale" was held to include condemnation is *Tiffany Studios v. Seibert*, 166 N.Y.S. 304. This involved interpreting a will which provided that certain heirs should receive stipulated shares upon the sale of real estate. Some of the land in the estate was taken by condemnation, and we believe that under the facts in that case the court properly interpreted the word "sale" to include condemnation.

■ In *Tyler v. Seiler*, 136 N.Y.S. 394, 395, a commission was allowed in a condemnation proceeding, but nevertheless the author of the court's opinion expresses our views in the instant case:

"The court is of the opinion that it was proven that the plaintiff was employed by the defendants; that the plaintiff found a party able and willing to purchase the premises, 29 Whipple Street, for $9,000, and procured that party to make the purchase; that it is fairly inferable that the sole purpose of the condemnation proceedings was to clear a defect in the title; that the property was acquired by the city for a sum in excess of the amount stipulated; and that the defendants received the purchase money.

"Whether the plaintiff earned his commission depends alone upon whether the minds of the parties met upon an agreement for the sale and whether the broker had been the procuring cause. *Tanenbaum v. Boehm*, 202 N.Y. 293, 299, 95 N.E. 708; *Davidson v. Stocky*, 202 N.Y. 423, 424, 95 N.E. 753; *Smith v. Peyrot,* 201 N.Y. 214, 94 N.E. 662.

\* \* \*

"It is not to be presumed that public officers, charged with the duty of acquiring land, would resort to condemnation proceedings, imposing a greater cost upon

the municipality, were that course not made necessary for some good public reason."

This method of using condemnation proceedings as a means of clearing the title, after there has been a meeting of the minds and a contract of purchase and sale has been agreed upon, also appears to be followed in federal practice as can be noted from the very recent case of *Albrecht v. United States,* 91 L. Ed. 461, 67 Sup. Ct. 606, U. S. Law Week 4200 (Nos. 148, 149, 150, 151 and 155), decided February 3, 1947. That case involved a contract of purchase and sale between certain individuals and the United States of America, and we find in the reported decision the statement: "The first contract condition as to payment was that it should be made upon conveyance of a good and merchantable title. The second was that if 'for any reason' the Attorney General did not approve the title, the Government could obtain a good title by condemnation proceedings in an appropriate district court, in which event the agreed compensation was to be deposited in court."

Unlike that case, the instant case shows no contract between a purchaser and seller for an agreed compensation. The compensation in the instant case had not been fixed by previous agreement, nor had the amount of the property taken been agreed upon. Both of these factors were determined in the condemnation suit itself. The test question propounded in *Tyler v. Seiler, supra,* of whether the minds of the parties met upon an agreement for the sale and whether the broker had been the procuring cause, must be answered in the negative. In the instant case there was no meeting of the minds upon an agreement for sale, and the brokers procured options from the landowner for the alleged purchaser rather than a purchaser for the landowner.

By this we do not mean to say that the federal government could not have been a purchaser. As we have seen, the very war emergency statute under which this condemnation proceeding was brought also contemplated

and authorized the acquiring of necessary property by purchase. There could have been that meeting of the minds that is necessary in every contract. There was none in this case. The basic nature of this distinction can be further realized when it is noted that a suit on a contract is one in personam, but an appropriation of private property for a public use is generally viewed as a proceeding in rem. 18 Am. Jur., p. 738, §112.

Counsel for the landowner also cite the Colorado statute re real estate brokers, '35 C.S.A., chapter 15, section 25, as applicable to this case, and show that an instruction was tendered in the words of the statute and refused by the trial court. We pass over this alleged error because we believe that Instruction No. 2, which was given, was wrong and points up the principal issue in this case. This instruction read as follows:

"You are instructed that if you believe from a preponderance of the evidence herein that plaintiffs at the request of the defendant performed services for her as real estate brokers and agents, then you are to return a verdict for the plaintiffs and against the defendant in such sum as you believe that the said services were reasonably worth, but not to exceed $7575.00.

"On the other hand, if you find by a preponderance of the evidence that the plaintiffs as real estate agents at the request of the defendant rendered no services for her as such, then you should return a verdict for the defendant."

It will be noted that this instruction allows recovery for services on a quantum meruit basis entirely, regardless of any express contract. The general rule is that, "There can be no implied contract where there is an express contract between the parties in reference to the same subject matter." 13 C.J., p. 243, §9; see, also, 17 C.J.S. Contracts, §5. This rule does not apply where the implied agreement is based on the subsequent conduct of the parties not covered by the express contract. *O'Byrne v. Lawson,* 110 Colo. 304, 134 P. (2d) 199. But

in this case the evidence shows that condemnation proceedings were instituted while the parties to this litigation were dealing under the express option contracts, and the only evidence of any other possible contract was the conversation that took place between the landowner's son and the brokers in the lawyer's office, after the government contractors had moved in on the property. But any possible services they could render the landowner from that point on could not pertain to earning a commission for procuring a purchaser, but as experts on land values to help boost the price in the condemnation proceedings. This the brokers subsequently offered to do, and their offer was rejected by the landowner.

We conclude, therefore, that the express option contracts have not been performed by the condemnation proceedings, for the federal government, exercising its right of eminent domain, moved in on the landowner's property and, like a sudden avalanche from the mountains above, occupied what land it sought to take—without warning to the owner. Two most important details in every purchase and sale are thus unceremoniously and completely removed from the owner's field of negotiation, i.e., *what* property should be sold and the *time when* possession should be given. The federal government, regardless of the landowner's desires, takes over what property it wishes and relentlessly moves in on it without consulting the owner.

The owner is further limited in a third detail, i.e., the power to negotiate as to the price. In the usual bargaining between seller and purchaser, the seller is in a position where he does not have to convey if the purchaser does not meet his terms; in a condemnation proceeding, the owner has lost the power to withhold the property or any portion of it; his field of negotiation is narrowed down to the two choices, (1) reaching an accord in respect to compensation for the property condemned, or (2) contesting the case in court. The owner is in court

whether he wants to be or not, and his only alternatives are to settle or litigate. He has lost his power to settle advantageously because at a time when of all times he should have possession, or the right to possession, of his property he has irrevocably lost it.

The fact that defendant, in the condemnation proceedings, signed a statement that she was receiving fair value for the premises taken, indicating that she was satisfied with the price, does not in our judgment alter the situation. The signing was obligatory. We have found no case that would suggest recovery of a commission under the facts of the instant case.

We believe that the result we have reached is in accord with the better rule, for, without questioning the good faith of any of the parties involved in this particular case, it can be noted that as a matter of practice a real-estate broker can protect himself by disclosing to his principal the possibility of condemnation proceedings and cover this contingency in his contract for commission. Only the very wary landowner will be able to protect himself from a broker who, after receiving information as to impending condemnation proceedings, may insert himself between the landowner and the condemnor.

The judgment is reversed.

Mr. Justice Hays dissents.

Mr. Justice Stone and Mr. Justice Luxford do not participate.

Mr. Justice Hays dissenting.

I dissent from the majority opinion for the reason that it is predicated, in my opinion, upon a cause of action in the complaint which has been abandoned, and not upon the one upon which the case was submitted to the jury.

There were two causes of action in the complaint: one based upon contract and the other upon quantum

meruit. At the close of all of the evidence, plaintiffs, pursuant to an order of the court, elected to stand upon quantum meruit, and thereby abandoned the cause based upon contract.

In the majority opinion the author states: "This case, therefore, presents a clear-cut issue of whether the unexpected condemnation by the government of some of the property, which had been the subject of negotiation between brokers and landowner for alleged sale to the government, operates as a sale so as to entitle the brokers to a commission when the land so taken in condemnation varies in both price and acreage from the provisions of written option contracts previously executed by the landowner at the instance of the brokers."

I am unable to agree with the above statement of the issues of this case. It is wholly immaterial in my view whether "condemnation by the government * * * operates as a sale" or that "the land so taken in condemnation varies in both price and acreage from the provisions of the written option contracts." The sole and only issue in the case is whether or not the plaintiffs rendered services as brokers and agents to the defendant at her request, and if so, the value of such services. I think Instruction No. 1, given by the trial court, is a correct statement of the issues in the case. It reads as follows:

"Plaintiffs claim that at the request of the defendant they performed services for her as real estate brokers and agents which were worth the sum of $7575.00, all of which has not been paid.

"Defendant denies that she employed the plaintiffs or that they rendered any services for her at her request; and also further denies that she owes them anything.

"These are the issues you are called upon to determine."

The trial court further instructed the jury:

"You are instructed that if you believe from a preponderance of the evidence herein that plaintiffs at the request of defendant performed services for her as real

estate brokers and agents, then you are to return a verdict for plaintiffs and against defendant in such sum as you believe that the said services were reasonably worth, but not to exceed $7575.00.

"On the other hand, if you find by a preponderance of the evidence that the plaintiffs as real estate agents at the request of the defendant rendered no services for her as such, then you should return a verdict for the defendant."

The majority opinion does not conform to the above statement of issues, and the theory upon which the case was tried, but on the contrary the author assumes, as I interpret the opinion, that the case was tried upon the contract cause of action of the complaint. This interpretation is further fortified by the following excerpts from the opinion:

"This case involves a commission for the sale of real estate."

"* * * Plaintiffs do not claim that they fulfilled any or all of the option contracts."

"There is no indication from Mr. Hackstaff's testimony that the landowner agreed to sell her property under any arrangement other than that contained in the written options, which he had obtained from her over a month's period of negotiations."

"Mr. Conway in his testimony, admitted that the landowner had made no agreements other than those contained in the four written options."

"The instant case shows no contract between a purchaser and seller for an agreed compensation."

"The instant case shows no contract between a purchaser and seller for an agreed compensation. The compensation in the instant case had not been fixed by previous agreement, nor had the amount of the property taken been agreed upon. Both of these factors were determined in the condemnation suit itself."

"By this we do not mean to say that the federal government could not have been a purchaser."

"There could have been that meeting of the minds that is necessary in every contract. * * * A suit on a contract is one in personam, but an appropriation of private property for a public use is generally viewed as a proceeding in rem."

"We conclude, therefore, that the express option contracts have not been performed by the condemnation proceedings."

In my judgment the above excerpts from the majority opinion are wholly inconsistent with an action on quantum meruit, but are consistent with the abandoned cause of action on a contract. The defendant accepted the services of the plaintiffs from day to day and apparently was well satisfied with what they were doing in an effort to have the government select her property for the arms plant. She discharged them when she reached a point in the negotiations where she felt that their services were no longer needed. "Under such circumstances we have held the law implies a promise on the part of the employer to pay the employee for the reasonable value of his services in the light of benefits conferred." *Milner v. Ruthven,* 116 Colo. 22, 178 P. (2d) 417.

In my opinion the trial court properly instructed the jury on quantum meruit, and the verdict of the jury, which is based upon abundant evidence, should be affirmed.