STATE of Colorado DEPARTMENT OF REVENUE, and Alan Charnes, Executive Director, Petitioners,

v.

ADOLPH COORS COMPANY, a Colorado corporation, Respondent.

No. 84SC322.

Supreme Court of Colorado, En Banc.

Sept. 8, 1986.

Rehearing Denied Sept. 29, 1986.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Robert L. Patterson and Steven M. Bush, Asst. Attys. Gen., Denver, for petitioners.

Bradley, Campbell & Carney, Professional Corp., Victor F. Boog, Golden, for respondent.

ERICKSON, Justice.

We granted certiorari to review the decision of the court of appeals in *Adolph Coors Co. v. Charnes*, 690 P.2d 893 (Colo. App.1984), which affirmed a district court judgment granting a tax refund on sales and use taxes paid from 1977 to 1980 by the Adolph Coors Company (Coors) on purchases of beer keg materials used in its beer-making business. The court of appeals held that the purchases were exempt from sales and use taxes because the beer kegs qualified as containers under sections 39–26–102(20)(a) and 39–26–203(1)(f)(I), 16B C.R.S. (1982). We affirm the judgment of the court of appeals.

I.

Coors, a Colorado corporation, brews and sells beer and has its principal place of business in Golden, Colorado. Coors paid Colorado sales taxes for the years 1978 to 1980 on certain materials (bung plates and tap wells), which were used in the assemblage of beer kegs, and paid Colorado use taxes for the years 1977 to 1979 on out-of-state purchases of other materials (aluminum discs), also used in manufacturing beer kegs.

On June 13, 1980, Coors filed a claim with the State of Colorado Department of Revenue (Department) for refunds in the total amount of $134,359.65 for sales and use taxes under section 39–26–102(20)(a), 16B C.R.S. (1982), and from use taxes under section 39–26–203(1)(f)(I), 16B C.R.S. (1982).

The essential facts are not in dispute. Coors is in the business of selling beer and cannot sell the beer without providing a container for it, such as a bottle, can, or keg. From 1977 to 1979, Coors purchased aluminum discs from Anaconda Corporation in St. Louis, Missouri, and paid the State of Colorado use taxes in the amounts of $15,699.65, $105,840.87, and $1,652.72 on these purchases. The discs were later transported by Coors to Hoover University, Inc. (Hoover), a corporation located in Beatrice, Nebraska, which manufactures beer kegs by forming the aluminum discs into keg halves and by welding the halves together and affixing a bung plate and a tap well to the keg. Hoover held a Colorado retail tax license. In the years 1978 to 1980, Coors paid Hoover for its labor in assembling the kegs and also paid Colorado sales taxes on the bung plates and tap wells in the amounts of $2,406.40, $6,676.61, and $2,083.10. The completed kegs were transported by Hoover to the Coors Brewery in Golden, Colorado.

From 1977 to 1980 Hoover manufactured 205,094 half-barrel kegs for Coors. The total cost for the completed half-barrel kegs, including the costs of the aluminum discs used in the manufacturing process, ranged from $44 per keg in 1977 to $54 per keg in 1980.[1] Hoover also manufactured

1. From 1977 to 1980, Coors paid Hoover for the half-barrel kegs at the price per keg and for the number of kegs listed below:

2,236 quarter-barrel kegs for Coors in 1979 at a cost of $39 each and 4,878 quarter-barrel kegs in 1980 at a cost of $40 each.

In its brewery, Coors fills the kegs with draft beer and delivers the kegs to its customers, mostly wholesale distributors, who then sell to retailers for resale to the ultimate consumers. The distributors are charged for the price of the beer plus a separate deposit of $12 for both the half- and quarter-barrel kegs. From 1977 to 1979 Coors charged distributors $9 for the beer in the quarter-barrel, and in 1980 it increased the price to $10. The price Coors charged distributors for the beer in a half-barrel keg was $15 in 1977 and $16 from 1978 to 1980. The charge for the beer plus the $12 deposit, therefore, varied from a low of $21 for a quarter-barrel keg in 1977 to a high of $28 for a half-barrel keg during the 1978–1980 period.

After the distributors purchase the beer from Coors, they in turn collect a $12 deposit per keg from the retailers, who then collect a $12 deposit from the consumer. When the empty kegs are returned by the consumers, the $12 deposit is refunded by the retailers, who then return the keg up the distribution line in exchange for the deposit. Coors places the deposits received from its distributors into a liability account until the keg is returned and the deposit is refunded to the distributor. The apparent purpose for requiring deposits is to cause the kegs to be returned to Coors for reuse.

Coors has a written agreement with its distributors that authorizes it to charge a distributor the full value of a keg if it is not returned, but Coors has never exercised that option or taken legal action against a distributor for failing to return a keg. However, during periods when there has been a shortage of kegs, Coors has urged its distributors to return the kegs more quickly. Coors washes and sterilizes the returned kegs for reuse, repairs them if necessary, and, if damaged beyond repair, sells them as scrap aluminum. The income from the scrap metal is recorded as miscellaneous income with any loss of value above the scrap metal value written off as a cost of doing business.

Coors' deposit system has been successful, in that the majority of kegs are ultimately returned for reuse. The average half-barrel keg is reused from 59 to 71 times, and the average quarter-barrel keg is reused from 48 to 53 times.[2] Coors inventories the kegs annually, including those in the hands of distributors and retailers. The number of kegs located during the inventory is subtracted from the number of kegs on Coors' books, with the difference representing the number of kegs for which deposits have been forfeited. Coors declares forfeited deposits as miscellaneous income, not income from the sale of an asset, and continually purchases new kegs to replace those damaged beyond repair or not returned.[3]

| 1977 | 51,005 | $44/each |
| 1978 | 100,963 | 48/each |
| 1979 | 34,476 | 49/each |
| 1980 | 18,650 | 54/each |

**2.** For the years 1978–1980 Coors sold keg beer in the following amounts:

| | 1/2 Barrel Kegs | 1/4 Barrel Kegs |
|---|---|---|
| 1978 | 2,316,993 | 147,834 |
| 1979 | 2,418,048 | 157,841 |
| 1980 | 2,694,151 | 176,806 |

The number of beer kegs in the possession of Coors and its distributors, based on its annual inventories, were:

| | 1/2 Barrel Kegs | 1/4 Barrel Kegs |
|---|---|---|
| 1978 | 370,764 | 29,127 |
| 1979 | 388,132 | 30,868 |
| 1980 | 358,799 | 31,529 |

The number of times the average keg is used per year can be calculated by taking the number of sales in each year divided by the number of kegs in inventory for the same year. This calculation yields the following annual uses per keg:

| | 1/2 Barrel Kegs | 1/4 Barrel Kegs |
|---|---|---|
| 1978 | 6.2 | 5.1 |
| 1979 | 6.2 | 5.1 |
| 1980 | 7.5 | 5.6 |

Each keg has a useful life of nine and one-half years, with the result that each half-barrel keg will be used approximately 59–71 times (6.2 x 9.5 = 59, 7.5 x 9.5 = 71) and each quarter-barrel keg will be used 48–53 times (5.1 x 9.5 = 48, 5.6 x 9.5 = 53).

**3.** In 1980, Coors declared $1,134,000 in income from forfeited deposits.

The Department made a final determination, pursuant to section 39–21–103(8), 16B C.R.S. (1982), that Coors was not entitled to a refund of the sales and use taxes. Coors appealed the final determination to the Jefferson County District Court, which reversed the determination and granted the refund on the basis that the beer kegs purchased by Coors were "containers" exempt from tax pursuant to section 39–26–102(20)(a), 16B C.R.S. (1982), and section 39–26–203(1)(f)(I), 16B C.R.S. (1982).

The court of appeals affirmed the district court, and we granted certiorari to consider whether Coors' purchases of the beer keg materials qualify for the container exemptions under Colorado's sales and use tax statutes.

The Department contends that the container exemptions should apply only to those containers which, along with the manufactured product, are resold by the manufacturer to its customers and should not exempt those containers that are owned and reused by the manufacturer. Coors, on the other hand, argues that all containers of a manufactured product are exempt regardless of their resale and, alternatively, that the beer kegs in question have been resold for the deposit charge within the meaning of the tax exemption statutes. For the reasons set forth in this opinion, we agree that Coors' purchases of beer keg materials qualifies for the container exemptions.

II.

■ Colorado imposes a sales tax "[o]n the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." Section 39–26–104(1)(a), 16B C.R.S. (1982). Colorado also imposes a use tax on "the privilege of storing, using, or consuming in this state any articles of tangible personal property purchased at retail." Section 39–26–202(1), 16B C.R.S. (1985 Supp.). The use tax is supplementary to the sales tax and does not apply to property subject to the sales tax. Section 39–26–203(1)(a), 16B C.R.S. (1982). As this court observed in *Bedford*

*v. Colorado Fuel and Iron Corp.*, 102 Colo. 538, 540, 81 P.2d 752, 753 (1938), the use tax "was designed to apply to the use and consumption of commodities elsewhere purchased at retail, which, if purchased in Colorado, would have been subject to the sales tax." Because the sales and use taxing schemes are designed to complement each other, provisions of one should be interpreted in harmony with provisions of the other.

The exemptions at issue here are contained in sections 39–26–102(20)(a) and 39–26–203(1)(f)(I), 16B C.R.S. (1982). Pursuant to section 39–26–102(20)(a), the following transactions are exempt from the sales tax:

Sales to and purchases of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit, or use, any article, substance, or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded, or furnished, *and the container, label, or the furnished shipping case thereof, shall be deemed to be wholesale sales and shall be exempt from taxation under this part 1.*

(Emphasis added.)

Section 39–26–203(1)(f)(I) provides a similar exemption from the use tax:

(1) [The use tax] . . . shall not apply:

(f)(I) To the storage, use, or consumption of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit, or use, any article, substance, or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded, or furnished, *and the container, label, or the furnished shipping case.*

(Emphasis added.)

This court previously construed these exemptions in *Weed v. Occhiato*, 175 Colo.

509, 488 P.2d 877 (1971). In *Occhiato*, we held that bottles purchased by a soft drink manufacturer and delivered by the manufacturer to buyers on a deposit and return basis were exempt containers pursuant to section 39–26–102(20)(a) and section 39–26–203(1)(f)(I). We rejected the Department's argument that the word "container" did not include returnable bottles, and held:

> *We see nothing in the statutory provisions which suggest that non-returnable bottles are containers and returnable bottles are something else.* Moreover, if the legislature had wished to make such a distinction, the manifestation of its intent could have been readily accomplished. *To us, it appears elementary that a bottle is a container, and whether or not a bottle is returnable is clearly of no consequence....*
>
> If a change in the law is desired, it must be accomplished by the General Assembly, for neither the Director of Revenue nor this Court is empowered with taxing authority.

*Id.* at 511, 488 P.2d at 878–79 (emphasis added).

*Occhiato* is directly in point. We cannot say that a soft drink bottle is a container, and a beer keg is not a container. A beverage cannot be sold without a container. Just as the Department argued in *Occhiato* that the definition of "container" was restricted to non-returnable bottles, it now argues that the term is restricted to containers which are resold to the consumer. The Department attempts to distinguish *Occhiato* on the basis that returnable soft drink bottles, but not beer kegs, are resold to consumers, and that *Occhiato* is therefore consistent with its position that the container exemptions are limited to containers held for resale.

The Department's argument, however, ignores the sound rationale of *Occhiato*. The phrase "container, label, or the furnished shipping case" contains no resale requirement, and we cannot restrict by judicial decision a provision that the General Assembly has left unrestricted. The Department urges us to follow the rule of construction that exemptions from tax must be construed against the taxpayer (citing *United Presbyterian Association v. Board of County Commissioners*, 167 Colo. 485, 496, 448 P.2d 967, 972 (1969)), while Coors relies on the rule that taxing acts must be construed in favor of the taxpayer (citing *City of Denver v. Sweet*, 138 Colo. 41, 52, 329 P.2d 441, 447 (1958)). In our view, it makes little difference whether the container exemptions are construed against or in favor of Coors; we cannot by construction amend the statute.

Significantly, the General Assembly amended the exemptions at issue here in 1982, yet it failed to alter our holding in *Occhiato*. *See* Ch. 153, sec. 1, § 39–26–102(20), 1982 Colo.Sess.Laws 568, 568; Ch. 153. sec. 3, § 39–26–203(1)(f), 1982 Colo. Sess.Laws 568, 569. Indeed, the container exemptions have remained unmodified and identical to their present form since they were originally enacted in 1935 and 1937. *See* Ch. 189, sec. 2(n), 1935 Colo.Sess.Laws 1000, 1003 (enacting the predecessor of section 39–26–102(20)(a), 16B C.R.S. (1982)); Ch. 230, art. VI. sec. 35(f), 1937 Colo.Sess. Laws 1098, 1100 (enacting the predecessor of section 39–26–203(1)(f)(I), 16B C.R.S. (1982)). It is well settled that an amendment of a statutory provision creates an inference of legislative approval of prior judicial interpretations left undisturbed by the amendment. *See, e.g., Tompkins v. DeLeon*, 197 Colo. 569, 571, 595 P.2d 242, 243–44 (1979) ("When the legislature reenacts or amends a statute and does not change a section previously interpreted by settled judicial construction, it is presumed that it agrees with judicial construction of the statute."); *Crownover v. Gleichman*, 194 Colo. 48, 51, 574 P.2d 497, 499 (1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978) ("when a legislature repeatedly reenacts a statute which has theretofore received a settled judicial construction, ... it must be considered that the particular statute is reenacted with the understanding that there be adherence by the judiciary to its former construction").

*Bedford v. Colorado Fuel and Iron Corp.*, 102 Colo. 538, 81 P.2d 752 (1938), and *I.B.M. v. Charnes*, 198 Colo. 374, 601 P.2d 622 (1979), relied on by the Department, are inapposite. In *Bedford*, we held that the purchase and use of mining equipment was subject to the sales and uses taxes where the equipment did not become a constituent part of a manufactured product held for sale. In *I.B.M.*, we held that purchases of constituent parts later incorporated into office equipment were subject to the use tax if the office equipment was used by the manufacturer itself and not resold. In neither *Bedford* nor *I.B.M.* did we discuss or interpret the container exemptions at issue here.

Courts of other jurisdictions interpreting similar provisions are in accord with the result we reach today. *See, e.g., Undercofler v. Buck*, 107 Ga.App. 870, 132 S.E.2d 157 (1963) (the sale and use of returnable milk and soft drink bottles are exempt from tax pursuant to exemption for "containers, labels, sacks, or bags used for packaging tangible personal property for shipment or sale"); *Coca-Cola Bottling Plants, Inc. v. Johnson*, 147 Me. 327, 87 A.2d 667 (1952) (distinction between returnable and non-returnable containers unimportant in construction of provision exempting "[containers] sold to persons for use in packing, packaging or shipping tangible personal property produced or sold by them"); *Evans v. Memphis Dairy Exchange*, 194 Tenn. 317, 250 S.W.2d 547 (1952) (court will not imply a resale requirement in statute exempting from tax "containers ... used for packaging tangible personal property for shipment or sale"). *But see Gay v. Canada Dry Bottle Co. of Florida*, 59 So.2d 788 (Fla.1952) (exemption for "containers ... [which are intended to be used one time only and are] used for packaging tangible personal property for shipment or sale" does not apply to containers sold on a deposit and return basis).

Accordingly, we must conclude that the only relevant inquiry in applying the container exemptions is whether the materials purchased by Coors were later used as "containers" in the sale of manufactured goods. Once stated in these terms, it cannot be disputed that Coors' purchases of beer keg materials qualifies for the exemptions.

## III.

■ Even assuming that the container exemptions require "resale," we hold that the beer kegs were "resold" when delivered by Coors to beer purchasers in exchange for a deposit refundable upon return of the beer keg.

The definition of a "sale" in the Colorado sales tax act is of little help in determining whether a delivery of a container on a deposit and return basis is a "resale" of the container. Section 39–26–102(10), 16B C.R.S. (1982), provides:

> "Sale" or "sale and purchase" includes installment and credit sales and the exchange of property as well as the sale thereof for money; [and] every such transaction, conditional or otherwise, for a consideration, constituting a sale; ....

Courts in other jurisdictions, however, have declared that delivery of a container on a deposit and return basis is a "resale" for purposes of sales and use taxation. *See, e.g., Belleville Dr. Pepper v. Korshak*, 36 Ill.2d 352, 221 N.E.2d 635 (1966) (purchase of bottles and cases by a soft drink manufacturer was a nontaxable, wholesale transaction because delivery of the bottles and cases to soft-drink buyers for a refundable deposit of forty percent of the actual cost of the bottles was a "resale"); *Department of Treasury v. Fairmount Glass Works*, 113 Ind.App. 684, 49 N.E.2d 1 (1943) (purchase of bottles by a brewer was a wholesale transaction because "sale or return" delivery of the bottles to beer purchasers was a "resale"); *Coca-Cola Bottling Works Co. v. Kentucky Department of Revenue*, 517 S.W.2d 746 (Ky.1974) (purchase of bottles and cases by a soft-drink manufacturer was a nontaxable, wholesale transaction because delivery of the bottles to soft-drink buyers for a refundable, two-cent per bottle deposit was a "resale"); *Goebel Brewing Co. v. Brown*, 306 Mich.

222, 10 N.W.2d 835 (1943) (purchase of bottles and cartons by a brewer was a nontaxable, wholesale transaction because delivery of the bottles and cartons to beer buyers for a refundable deposit was a "resale").

In addition, the Colorado Uniform Commercial Code indicates that deposit-and-return containers are "resold" when delivered to product buyers. Section 4–2–106(1), 2 C.R.S. (1973), provides that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price...." "Price" is not defined in the Code, but "value" includes "any consideration sufficient to support a simple contract." § 4–1–201(44)(d), 2 C.R.S. (1973). It is axiomatic contract law that legal sufficiency of consideration does not depend on the comparative economic value of the exchange and that consideration is not insufficient merely because it is inadequate. Restatement (Second) of Contracts § 79 (1981); *Lampley v. Celebrity Homes, Inc.*, 42 Colo.App. 359, 594 P.2d 605 (1979). The small price of the deposit for the beer kegs, by itself, clearly cannot preclude a finding of "resale."

Finally, section 4–2–401(1)–(2), 2 C.R.S. (1973), discusses "passing of title":

> Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest....
>
> (2) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place....

There is no question that Coors delivered the beer kegs to the buyers. Under the quoted statutory language, any contractual arrangements used by Coors to "reserve title" in order to ensure return of the kegs could not stop title from passing and thereby prevent a "sale." The provision in the sales contracts requiring return of the kegs could create, at most, a security interest in favor of Coors. The kegs therefore were "resold" when delivered to beer purchasers in exchange for a refundable deposit, and Coors' purchases of materials to construct the kegs are exempt from sales and use taxation even under the department's restrictive interpretation.

The judgment of the court of appeals is affirmed.

QUINN, C.J., dissents.

DUBOFSKY and LOHR, JJ., join in the dissent.

QUINN, Chief Justice, dissenting:

The majority holds that the purchases of beer keg materials by Adolph Coors Company (Coors) for use in its beer-making business qualified for the container exemptions under sections 39–26–102(20)(a) and 39–26–203(1)(f)(I), 16B C.R.S. (1982), and were thus exempt from the Colorado sales and use taxes. In reaching this result the majority refuses to read a resale requirement into the exemption statutes, and then reasons that even under a resale requirement the beer keg materials were indeed purchased for resale and resold to Coors' distributors. I dissent from the court's opinion on both counts.

### I.

Colorado's scheme for sales and use taxes must be the starting point of any meaningful analysis of Coors' claim for refunds. A sales tax is imposed on "the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." § 39–26–104(1)(a), 16B C.R.S. (1982). A "retail sale" includes all sales within the state except "wholesale sales." § 39–26–102(9), 16B C.R.S. (1982). A "wholesale sale" is "a sale by wholesalers to retail merchants, jobbers, dealers, or other wholesalers for *resale* and does not include a sale by wholesalers to users or consumers not for resale." § 39–26–102(19), 16B C.R.S. (1982) (emphasis added). A use tax, which is supplementary to the sales tax and does not apply to property

subject to the sales tax, § 39–26–203(1)(a), 16B C.R.S. (1982); *see Bedford v. Colorado Fuel & Iron Corp.*, 102 Colo. 538, 540, 81 P.2d 752, 753 (1938), is imposed on "the privilege of storing, using, or consuming in this state any articles of tangible personal property purchased at retail," § 39–26–202(1) (1985 Supp.).

The container exemptions on which Coors based its refund claim constitute but a small part of a statutory exemption scheme that is primarily directed at tangible personal property entering into or becoming a part of a finished manufactured product. The sales tax exemption, for example, reads as follows:

> Sales to and purchases of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit, or use, any article, substance, or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded, or furnished, *and the container, label, or the furnished shipping case thereof, shall be deemed to be wholesale sales and shall be exempt from taxation under this part 1.*

§ 39–26–102(20)(a), 16B C.R.S. (1982) (emphasis added). In similar fashion, section 39–26–203(1)(f)(I), 16B C.R.S. (1982), states that the use tax shall not apply:

> To the storage, use, or consumption of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit, or use, any article, substance, or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded, or furnished, *and the container, label, or the furnished shipping case.*

(emphasis added).

Focusing on the fact that "[t]he phrase 'container, label, or the furnished shipping case' contains no resale requirement," the majority concludes that "we cannot restrict by judicial decision a provision that the General Assembly has left unrestricted." Majority opinion at p. 1345. My disagreement with the court's holding is twofold: first, the court reaches a result that is at odds with the structure and goals of the statutory taxing scheme; and second, the court attempts to force this court's prior decision in *Weed v. Occhiato*, 175 Colo. 509, 488 P.2d 877 (1971), into service as a *per se* exception applicable to all containers used by a manufacturer in distributing its product, when *Occhiato* was neither intended to support, nor is capable of supporting, such an expansive rule.

### A.

A statute should be construed in a manner that renders it effective in accomplishing the purposes for which it was enacted, *e.g., Safeway Stores, Inc. v. Smith,* 658 P.2d 255 (Colo.1983); *People v. Lee,* 180 Colo. 376, 506 P.2d 136 (1973), and the meaning of any one section must be gathered from a consideration of the entire legislative scheme, *e.g., State Highway Commission v. Haase,* 189 Colo. 69, 537 P.2d 300 (1975). As this court observed in *Paxson v. Cresson Mining Co.,* 56 Colo. 206, 212, 139 P. 531, 533 (1913):

> The fundamental rule to be followed in construing a statute is to ascertain and give effect to the intention of the legislature in adopting it, and give effect, if possible, to every word it contains, and as far as practicable reconcile the terms therein employed so as to render it consistent and harmonious.

The Colorado sales tax is designed to impose a tax on that which "is consumed and used" and to exempt "only that which is sold for resale." *Bedford,* 102 Colo. at 543, 81 P.2d at 754–55 (1938). The use tax is designed "to apply to the use and consumption of commodities elsewhere purchased at retail, which, if purchased in Colorado, would have been subject to the sales tax." *Bedford,* 102 Colo. at 540, 81 P.2d at 853. Since the sales and use taxing schemes are designed to supplement each other and provide for substantially identi-

cal exemptions, a judicial interpretation of one exemption should not be disregarded in interpreting the other. *Id.*

In determining the applicability of the sales tax to a particular transaction, we have previously singled out "the disposition of the goods made by the buyer, and not the character of the business of the seller or buyer," as the controlling factor in distinguishing between a "wholesale sale" and a "retail sale." *Bedford,* 102 Colo. at 543, 81 P.2d at 755. Exempting from taxation intermediate sales of items incorporated into a finished product ultimately sold at retail not only avoids "a pyramiding of sales taxes [o]nto the cost of the finished product," but also, consistent with the statutory design, imposes the tax "on the end transaction;" for it is that transaction which "should be the measure of the total imposition on the composited product." *Carpenter v. Carman Distributing Co.,* 111 Colo. 566, 572, 144 P.2d 770, 772–73 (1943).

It was in light of these statutory goals of avoiding multiple taxation and imposing the tax on the final consumptive transaction that *Bedford* expressly referred to the critical role played by the resale requirement in construing sales and use tax exemptions, noting that the fundamental interest underlying the taxing scheme is to exempt only "that which is sold for resale." 102 Colo. at 543, 81 P.2d at 754–55. Until today, our decisions subsequent to *Bedford* have followed the rationale of that case in interpreting and applying the sales and use tax exemptions. *See, e.g., International Business Machines Corp. v. Charnes,* 198 Colo. 374, 601 P.2d 622 (1979) (purchases by IBM of component parts used in manufacturing typewriters not exempt from use tax when IBM used completed typewriters for its own business operations, thereby transforming wholesale transactions into retail ones and rendering IBM the final consumptive user, rather than the seller, of the completed products); *Western Electric Co. v. Weed,* 185 Colo. 340, 524 P.2d 1369 (1974) (purchases by Mountain Bell of telephones, poles, and other switching equipment not exempt from sales and use taxes under wholesale exemption, because the items did not become a constituent part of the service rendered the customer); [1] *Carman Distributing Co.,* 111 Colo. 566, 144 P.2d 770 (purchases by laundries of buttons and thread for repair of clothes and paper and twine for wrapping laundered clothes not exempt from sales tax under wholesale exemption, since items in question were used and consumed by laundries as incident to the service provided the customers and not resold to customers).

Although neither *Bedford* nor these subsequent cases specifically construed the container exemption involved here, each decision analyzed the claimed exemption by focusing on the structure and purposes of the taxing scheme. It is that type of analysis which the majority eschews, choosing instead to resolve Coors' refund claim on the basis of a wooden reading of the container exemptions that cannot be reconciled with the organic law applicable to sales and use taxes.

A rule can only be as sound as the doctrine it attempts to serve. The rule adopted by the majority virtually exempts

---

**1.** In *Western Electric Co. v. Weed,* 185 Colo. 340, 351–52, 524 P.2d 1369, 1375 (1974), the court cited as support for its conclusion *Southwestern Bell Telephone Co. v. State Commission of Revenue & Taxation,* 168 Kan. 227, 212 P.2d 363 (1949), a decision which relied heavily on *Bedford v. Colorado Fuel & Iron Corp.,* 102 Colo. 538, 81 P.2d 752 (1938), and in which a claim was disallowed under a Kansas statute almost identical to the Colorado sales tax exemption because, in part, the telephone equipment was not purchased for resale. The Kansas court in *Southwestern Bell* noted that the principle behind the exemption was that the ultimate consumer would pay the tax and no article should carry more than one sales tax:

> The intention was that in the various steps between a loaf of bread and the wheatfield the person who bought the wheat from the farmer should not pay a sales tax nor the mill that bought it from the elevator man nor the jobber who bought the flour from the mill nor the baker who bought the flour from the jobber.

168 Kan. at 233, 212 P.2d at 367. Once title comes to rest, however, and no further resale is contemplated, the tax should then be imposed. *Id.*

from taxation all containers used by a manufacturer in distributing its product to its customers, regardless of the fact that the manufacturer purchases the containers for reuse, uses the same container again and again in the distribution process, and retains title to the containers throughout their useful life. Such a rule falls far short of serving the overriding purposes of the statutory taxing scheme. In my view, the dispositive consideration in determining the applicability of the container exemptions to beverage containers should be whether the containers or container materials were purchased by the beverage manufacturer for resale to its customers.[2]

### B.

The majority, in reaching its decision, builds on *Weed v. Occhiato,* 175 Colo. 509, 488 P.2d 877, and constructs what appears to be a *per se* exemption applicable to any and all containers used by a manufacturer in distributing its product to customers. *Occhiato,* however, is not adequate to the task of supporting the legal structure raised by the court in this case.

The issue in *Occhiato* was whether the container exemptions were applicable to purchases of returnable bottles by a soft drink bottler. In holding that the purchases were exempt from sales and use taxes, this court declined to distinguish between returnable and nonreturnable bottles, stating that "a bottle is a container, and whether or not a bottle is returnable is clearly of no consequence." 175 Colo. at 511, 488 P.2d at 878–79. The court of appeals seized upon this language in the instant case and concluded that, because under *Occhiato* a soda bottle is a container, "a beer keg is a container and, as such, is exempt

from sales or use tax." *Adolph Coors Co. v. Charnes,* 690 P.2d 893, 895 (Colo.App. 1984). The majority echoes this same reasoning when it states that "[w]e cannot say that a soft drink bottle is a container, and a beer keg is not a container." Maj. op. at 1345. The critical question, however, should not be whether a beer keg is a container—no one can reasonably dispute that fact—but whether the beer keg materials purchased by Coors qualified for the Colorado sales and use tax container exemptions. That question can only be answered by analyzing the container exemption within the framework of the entire statutory scheme—an inquiry the majority declines to make. By refusing to make this inquiry, the majority improperly resolves as a matter of law what should more properly be resolved as a matter of fact under appropriate legal standards.

Were the proper question asked in this case, it would be abundantly clear that *Occhiato* should not be read to exempt from sales and use taxes all beverage containers used by a manufacturer in the distribution of its product. Such an expansive reading of *Occhiato* is clearly inimical to the overriding statutory goal of imposing a sales or use tax on the final consumptive transaction involving the product in question. *Carman Distributing Co.,* 111 Colo. at 572, 144 P.2d at 772–73. Furthermore, *Occhiato* was a fact-specific case involving soft-drink bottles and the judgment rendered in that case is not irreconcilable with the resale requirement. A number of courts, for example, have concluded that beverage bottles are tax exempt because they have been "resold"—that is, the bottlers had transferred both title and possession of the bottles to its customers, with

---

**2.** Basing the exemptions on whether purchases are for resale fulfills the goals of the exemptions by preventing multiple taxation on a manufactured product and by placing the burden of taxation on the user or consumer of the product. For example, a bakery which buys plastic bags in which it packages manufactured bread would not pay tax on the bags under the exemption because the plastic bags are sold along with the bread to the distributor and grocery store and ultimately to the consumer. Following the retail sale to the consumer, both the ingredients in the bread and the container are consumed—that is, the bread is eaten, and the plastic bag is either reused or thrown out as the consumer chooses. Each plastic bag accompanies only one loaf of bread, and its full cost is capitalized into that loaf of bread, just like the flour and other ingredients. The sales tax, therefore, is paid by the consumer on the full cost of the bag, as well as the full cost of the ingredients used to make the loaf of bread.

the result that the bottler had no right to reclaim the bottles and the customer had no obligation to return them. *E.g., Belleville Dr. Pepper v. Korshak,* 36 Ill.2d 352, 221 N.E.2d 635 (1966); *Department of Treasury v. Fairmount Glass Works,* 113 Ind.App. 684, 49 N.E.2d 1 (1943); *Coca-Cola Bottling Works Co. v. Kentucky Department of Revenue,* 517 S.W.2d 746 (Ky. 1974); *Goebel Brewing Co. v. Brown,* 306 Mich. 222, 10 N.W.2d 835 (1943). *Occhiato's* conclusory holding, therefore, is supportable under a resale analysis on any one of several grounds—*e.g.,* that the deposit charged for the bottles was substantially equivalent to their cost, *see Fairmount Glass Works,* 113 Ind.App. 684, 49 N.E.2d 1; that any difference between the actual cost and the deposit was reflected in the price of the beverage, *Belleville Dr. Pepper,* 36 Ill.2d 352, 221 N.E.2d 635; that the bottling company sold the bottles below cost in anticipation that most bottles would be returned for reuse; *Coca-Cola Bottling Works Co.,* 517 S.W.2d 746; *Smith Beverage Co. of Columbia v. Reiss,* 568 S.W.2d 61 (Mo.1978); or that charging the full cost of the bottles would decrease sales, *District of Columbia v. Seven-Up Washington, Inc.,* 214 F.2d 197, (D.C.Cir.1954), *cert. denied* 347 U.S. 989, 74 S.Ct. 851, 98 L.Ed. 1123 (1954).

Finally, since *Occhiato* was limited to soft drink bottles and its holding was not irreconcilable with the overriding goals of the taxing scheme, I view the legislature's failure to alter the result in *Occhiato* as quite understandable, and, in contrast to the majority, I attach no significance whatever to legislative inaction in this area of the law.

## II.

Having determined that there is no "resale" requirement for the container exemption, the court nonetheless goes on to conclude that Coors did resell the beer kegs to its customers. Contrary to the majority, I am convinced these purchases were not for the purpose of resale, as demonstrated by the absence of any resale of the beer kegs to Coors' customers, and that Coors thus stood in the position of an ultimate consumer or user with respect to the beer keg materials.

## A.

Because section 39–26–102(10), 16B C.R.S. (1982), merely includes certain types of transactions within the category of "sale" without offering a generic definition of the term "sale,"[3] it is appropriate to look to other sources for the basic characteristics of a "sale," for it is these characteristics that will equally apply to the "resale" requirement for purposes of the container exemptions at issue here.

It is a cardinal rule of statutory construction that a word is to be construed according to its "common usage" and that a term which has acquired a technical meaning should be interpreted according to its technical import. § 2–4–101, 1B C.R.S. (1980). The term "sale" is commonly used to refer to a contract whereby the ownership of property is transferred from one person to another for a sum of money or other valuable consideration. *Webster's Third New International Dictionary* 2003 (1961); *see also Black's Law Dictionary* 1200 (rev. 5th ed. 1979) (sale implies the passing of "general and absolute title, as distinguished from a special interest falling short of complete ownership"). The technical sense of "sale" is basically in accord with this commonly understood meaning of that term. *See, e.g., Dryden v. Michigan State Industries,* 66 F.2d 950 (8th Cir.1933) (sale requires passage of title); *Wilson v. Ross Investment Co.,* 116 Colo. 249, 180 P.2d 226 (1947) (sale means a contract between parties "to give and pass rights of property for money"); *H.S. Crocker Co. v. McFaddin,* 148 Cal.App.2d 639, 307 P.2d 429 (1957) (sale requires a transfer of owner-

---

3. For purposes of Colorado sales and use taxes, section 39–26–102(10), 16B C.R.S. (1982), includes within the category of "sale" such transactions as "installment and credit *sales* and the exchange of property as well as the *sale* thereof for money" and "every such transaction, conditional or otherwise, for a consideration, constituting a *sale.*" (emphasis added).

ship); *Chapin v. Tampoorlos*, 325 Ill.App. 219, 59 N.E.2d 334 (1945) (sale requires a transfer of general or absolute property, with no further rights therein reserved to seller); *Garfield v. Furniture Fair-Hanover*, 113 N.J.Super. 509, 274 A.2d 325 (1971) (a sale passes title to buyer). In similar fashion, the Uniform Commercial Code defines "sale" to require "the passing of title from the seller to the buyer for a price." § 4-2-106, 2 C.R.S. (1973); *see generally* 1 R. Anderson, *Uniform Commercial Code* § 2-106:5 at 599-600 (3d ed. 1981).

Under both its commonly accepted and technical meanings, therefore, the term "sale" requires more than a mere temporary transfer of property for money. *See Sturm v. Boker*, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093 (1893); *Herbertson v. Cruse*, 115 Colo. 274, 170 P.2d 531 (1946); *Furniture Fair-Hanover*, 113 N.J.Super. 509, 274 A.2d 325. To conclude otherwise results in virtually obliterating any meaningful distinction between a "sale" and other legally recognized types of temporary or conditional transfers of property for consideration. *Cf. Christensen v. Hoover*, 643 P.2d 525, 528-29 (defining bailment as "a delivery of personal property by one person to another in trust for a specific purpose, with an express or implied contract that the property will be returned or accounted for when the specific purpose has been accomplished or when the bailor reclaims the property"). I would therefore hold that the term "sale" for purposes of the container exemptions in sections 39-26-102(20)(a) and 39-26-203(1)(f)(I), 16B C.R.S. (1982), means a transaction in which title to goods is passed from the seller to the buyer for a price. This definition comports with the structure and purpose of the taxing scheme, which is to impose a sales or use tax on the final consumptive transaction involving the product in question. *See, e.g., Carman Distributing Co.*, 111 Colo. at 572, 144 P.2d at 772-73.

### B.

The long-standing rule in cases of this type is that "the presumption is against tax exemption, and the burden is on the one claiming the exemption to establish clearly his right thereto." *United Presbyterian Association v. Board of County Commissioners*, 167 Colo. 485, 496, 448 P.2d 967, 972 (1968), *accord, e.g., Security Life & Accident Co. v. Heckers*, 177 Colo. 455, 495 P.2d 225 (1972). Viewing the record in this light, I am satisfied that Coors' delivery to its distributors of beer kegs originally costing Coors $39 to $54 in exchange for a $12 deposit per keg did not constitute "sales".

The agreement between Coors and its distributors makes abundantly clear that the distributors did not obtain full title to the beer kegs and thus were not free to retain the kegs or to dispose of them at will, at least without subjecting themselves to the risk that Coors would charge them the full cost of the kegs or demand their return. The agreement also demonstrates that Coors' delivery of the beer kegs to its distributors did not thereby divest Coors of all right to reclaim possession of the kegs upon the distributors' failure to return them within a reasonable time. *See generally Belleville Dr. Pepper*, 36 Ill.2d 352, 221 N.E.2d 635; *Smith Beverage Co. of Columbia v. Reiss*, 568 S.W.2d 61 (Mo. 1978).

In addition to the agreement, there is undisputed evidence of Coors' conduct with respect to the beer kegs. The record shows that Coors reused the average keg 48 to 71 times. Such a high rate of use indicates that Coors purchased the kegs not to resell them to its consumers but to reuse the kegs in its business. *See, e.g., District of Columbia v. Seven-Up Washington*, 214 F.2d 197, *cert. denied*, 347 U.S. 989, 74 S.Ct. 851, 98 L.Ed. 1123 (1954); *Gay v. Canada Dry Bottling Co.*, 59 So.2d 788 (Fla.1952); *Pepsi-Cola Bottling Co. v. Peters*, 189 Neb. 271, 202 N.W.2d 582 (1972).

Coors' intent to retain full ownership of the beer kegs is nowhere more obvious than in the manner in which it treated the beer kegs for state and federal income tax purposes. Although not mentioned by the majority, the record shows that Coors

claimed the beer kegs as its property, that Coors depreciated the kegs, and that this depreciation extended to those kegs in the hands of its distributors and retailers. It is inconsistent for Coors to contend that it has sold the kegs for purposes of the sales and use tax exemptions and then to depreciate the same kegs for income tax purposes. Durable containers used to ship products may be depreciated for federal income tax purposes only if: "they have a life longer than one year; they qualify as property used in [a trade or] business; and *title to them does not pass to the buyer.*" Internal Revenue Service, Publication No. 534 at 2 (1985) (emphasis added). *See also Buck v. Commissioner,* 83 F.2d 627 (9th Cir.1936); *Iten Biscuit Co. v. Commissioner,* 25 B.T.A. 870 (1932); 3 Stand.Fed.Tax Rep. (CCH) ¶ 1715.35 (1986).

### C.

The majority characterizes Coors' right to charge the full cost or demand the return of the keg as a security interest because section 4–2–401, 2 C.R.S. (1973), provides that any retention or reservation of title under a contract for the sale of goods is in reality a security interest and that title passes at the time the goods are shipped or delivered. This section deals with situations where, under a contract of sale, title is intended to pass to the buyer upon complete performance, *i.e.,* payment, but the seller wants to retain title in case the buyer defaults. In those situations section 4–2–401 provides that title passes immediately upon shipment or delivery and that the seller's retention of title documents merely reserves a security interest in the property, thereby giving the seller a remedy if buyer does fail to perform. Section 4–2–401, however, does not pass title in all transfers of goods where title is reserved. The Uniform Commercial Code recognizes that sometimes title is reserved because *no sale* is intended. Section 4–1–201(37), 2 C.R.S. (1985 Supp.), for example, provides in part that "[u]nless a lease or consignment [of goods] is intended as security, reservation of title thereunder is not a 'security interest.' The interest of a 'true lessor' of

personalty such as equipment is not an Article Nine security interest." J. White and R. Summers, *Uniform Commercial Code* § 877 (1980).

In this case, Coors was not transferring beer kegs under a contract of sale and retaining title as a means of assuring payment. Far from intending that title pass to its distributors, Coors' intent was that the kegs were to be returned for subsequent use and that only in the event the distributor did not return the kegs would Coors charge the distributor for the full cost of the kegs, at which point the distributor then would presumably have full ownership, including title.

### D.

The consequences of the majority's holding should not be overlooked. One result of finding a resale in this case is that the beer kegs will never be taxed due to the lack of a final consumptive transaction on which to impose a tax. Under the court's holding, each person obtaining a beer keg in the distribution process would be obtaining it, not as ultimate consumer, but presumably for the purpose of reselling it for $12. The distributor, for example, would resell it to the retailer, who in turn would resell it to the consumer, who after consuming the beer would then resell the keg to the retailer and so on up the line of distribution. It is possible, of course, to avoid this interminable resale problem by concluding that the purchase of the beer by the ultimate consumer is the final consumptive transaction which justifies the imposition of a tax on the $12 paid by the consumer for the keg. This conclusion, however, creates several problems. If the consumer were ultimately to return the keg, he might be entitled to the $12 plus the tax paid by him—a result that would deprive the state of any revenue from the sale or use of the beer kegs actually returned. *See Gay,* 59 So.2d at 789–90. If, on the other hand, the consumer were not to return the beer keg, the state would then only receive the tax levied on the $12 deposit rather than on the actual cost of the keg. The result is that

"[t]he tax is levied only on this fractional amount, a result out of accord with reality," *Seven-Up Washington*, 214 F.2d at 202, and obviously inconsistent with the revenue raising purpose of the taxing scheme. A last possibility is that the consumer would be entitled only to the $12, but not a refund on any tax actually paid, thereby resulting in the collection of a tax on the $12 deposit every time the keg was reused. If the keg were to be reused 60 times, a tax would be collected on $720, an amount far above the actual cost of the keg. This result creates rather than avoids multiple taxation on the same product—a result also at variance with the .purpose of the statutory scheme.

Because I am unable to discern any plausible rationale for the court's decision, I dissent.

I am authorized to say that Justice DUBOFSKY and Justice LOHR join me in this dissent.