**A.B. HIRSCHFELD PRESS, INC., a Colorado corporation, Petitioner,**

v.

**The CITY AND COUNTY OF DENVER; Thomas P. Briggs, in his capacity as Manager of Revenue of the City and County of Denver; and Milo E. Scram, in his capacity as Hearing Officer of the Department of Revenue of the City and County of Denver, Respondents.**

No. 89SC109.

Supreme Court of Colorado,
En Banc.

Feb. 11, 1991.

As Modified on Denial of
Rehearing March 11, 1991.

Vinton, Waller, Slivka & Panasci, P.C., Denis H. Mark, Lentz, Evans and King, P.C., Robert A. Wherry, Jr., Denver, for petitioner.

Patricia Wells, City Atty., Robert F. Strenski, Asst. City Atty., Denver, for respondents.

Holme Roberts & Owen, Charles A. Ramunno, Michael W. Bruzga, Denver, for amicus curiae The Printing Industries Ass'n Mountain States.

Justice KIRSHBAUM delivered the Opinion of the Court.

In *A.B. Hirschfeld Press, Inc. v. City and County of Denver*, 779 P.2d 1356 (Colo.App.1988), the Colorado Court of Appeals affirmed the conclusion of the District Court for the Second Judicial District that respondent City and County of Denver (the City) properly assessed a use tax against petitioner A.B. Hirschfeld Press, Inc. (Hirschfeld), pursuant to the Revised Municipal Code of the City and County of Denver (the Code), for certain items purchased by Hirschfeld in the course of its business activities. We granted certiorari to consider whether the purchases of the items were purchases for resale and therefore exempt from the imposition of use taxes under applicable provisions of the Code. We affirm the judgment of the Court of Appeals.

## I

Hirschfeld is engaged in the business of commercial printing, producing products such as brochures, letterheads and greeting cards in response to orders specified by its customers. Hirschfeld must obtain and use several items of tangible personal property referred to by the parties as "pre-press materials," to produce any particular product.

In December 1983, the City's Department of Revenue (the Department) conducted an audit of purchases of items of pre-press materials made by Hirschfeld during 1980, 1981 and 1982. As a result of that audit, the Department assessed use taxes against Hirschfeld on the basis of some of those purchases. Hirschfeld protested the assessments with regard to its purchases of film, negatives, positives, press plates, transparencies, photographs and color separations.[1] It asserted, *inter alia*, that these items had been purchased for resale and, therefore, were exempt from use tax assessment under section 53–95(21)(a) of the Code.[2]

---

1. These are the only items disputed by Hirschfeld in its appeal to the Court of Appeals. It initially challenged use tax assessments levied against purchases of ink additives, contact paper, automask, sheen, airbrush photo services, color keys, lasertones, and promotional products such as bottle caps, toys, gumball machines and Christmas cards.

2. The parties, the district court and the Court of Appeals applied a version of the City Use Tax Ordinance, §§ 53–91 to –150, which became effective December 17, 1984, and this court will

As a result of Hirschfeld's protest, an administrative hearing was conducted by the Department, pursuant to section 53–118 of the Code. The hearing officer made several findings of fact and, on the basis of those findings, entered an order rejecting Hirschfeld's protest and ordering payment of the delinquent taxes plus penalties and interest. Hirschfeld sought judicial review of the hearing officer's order pursuant to C.R.C.P. 106(a)(4). The district court affirmed the hearing officer's order insofar as it denied Hirschfeld's protest,[3] citing this court's decision in *Carpenter v. Carman Distributing Co.*, 111 Colo. 566, 144 P.2d 770 (1943), as support for its conclusion. On appeal, the Court of Appeals held that Hirschfeld's purchases were not exempt from the imposition of use taxes because Hirschfeld did not purchase the pre-press materials primarily for resale.

## II

To determine the applicability of the relevant provisions of the Code to Hirschfeld's purchases of pre-press materials, the following pertinent facts found by the hearing officer must be considered. Hirschfeld's function is to print materials ordered by its customers. Whether and to what extent Hirschfeld must use pre-press materials to fill a customer's order depends upon the situation; for example, customers sometimes provide pre-press materials to Hirschfeld. When Hirschfeld purchases pre-press materials, the materials are acquired for Hirschfeld's use in producing final products ordered by its customers.

The cost of all pre-press materials necessary to complete an order is included in any bid prepared by Hirschfeld and is incorporated into the price ultimately paid to Hirschfeld for the final product. However, Hirschfeld neither itemizes specific charges for pre-press materials nor identifies such materials on its statements to customers. Hirschfeld collects the applicable sales tax or use tax for the sale of a final product to a customer based on the total sales price charged for that product.

Once processed, pre-press materials are usable only for a particular order and become the property of the customer at the time the final product is delivered to the customer. However, Hirschfeld often reuses processed pre-press materials to print reruns of a final product. Hirschfeld typically retains possession of a customer's pre-press materials, but delivers them to the customer when so directed by the customer.

## III

The Code authorizes the imposition of use taxes only upon property purchased at retail. Hirschfeld argues that its purchases of pre-press materials were wholesale purchases as defined by the Code and therefore were not subject to the imposition of use taxes.[4] The City contends that the purchases were purchases at retail as defined by the Code and therefore were

---

treat that version of the ordinance as the applicable law in the present case. However, it is important to note that during the relevant period when Hirschfeld was audited by the Department—January 1, 1980, to December 31, 1982—the City Use Tax Ordinance existed in several successive versions as it was repealed, reenacted and amended. From January 1, 1980, to December 31, 1981, the City Use Tax Ordinance was codified at Denver, Colo.Rev.Mun.Code 166A.1 to .19 (Ord. No. 250–50, 1950, rev. 1964, 1967, 1970, 1976 and 1978). The ordinance was repealed and reenacted on January 1, 1982, and thereafter codified at §§ 53–91 to –150. Certain sections of the ordinance were amended on March 22, 1982, and the Code remained in that form through December 31, 1982.

**3.** The district court reversed the hearing officer's assessment of penalties.

**4.** Hirschfeld also argued initially that purchases of certain ink additives, including flash oil, press wax and tack knocker, were specifically exempt from the imposition of use taxes under the manufacturing exemption contained in § 53–95(21)(b) of the Code because those items formed a physical and chemical component of the finished printed materials. The hearing officer disagreed, finding Hirschfeld's evidence inconclusive as to whether such materials were actually integrated into the final product. Hirschfeld does not challenge that ruling and does not contend here that its purchases of pre-press materials are exempt from the imposition of use taxes under § 53–95(21)(b).

subject to the imposition of use taxes. We agree with the City.

Use taxes are imposed for the privilege of using property and are distinct from, though complementary to, sales taxes. *See Howard Elec. and Mech., Inc. v. Department of Revenue,* 771 P.2d 475 (Colo.1989). Section 53–92(a) of the Code sets forth the general policy of the City respecting the imposition of use taxes as follows:

> (a) It is hereby declared to be the legislative intent of the city, acting through its duly elected representatives, that, for the purposes of this article, every person who stores, uses, distributes or consumes in the city any article of tangible personal property or who consumes or stores a service subject to the provisions of this article, purchased at retail, is exercising a taxable privilege.

Denver, Colo.Rev.Mun.Code § 53–92(a) (1984).

Section 53–96 of the Code authorizes the imposition of use taxes in the following pertinent language:

> There is levied and there shall be collected and paid a tax in the amount stated in this article, by every person exercising the taxable privilege of storing, using, distributing, or consuming in the city ... any article of tangible personal property, purchased at retail, for said exercise of said privilege ... [o]n the purchase price paid or charged upon all sales and purchases of tangible property....

Denver, Colo.Rev.Mun.Code § 53–96 (1984).

A "retail sale" is defined in sweeping terms as any sale "except a wholesale sale." Denver, Colo.Rev.Mun.Code § 53–95(12) (1982). As applicable here, a wholesale sale is defined as a sale "by wholesalers to licensed retail merchants, jobbers, dealers or other wholesalers for resale, and does not include ... a sale by wholesalers to users or consumers not for resale...." Denver, Colo.Rev.Mun.Code § 53–95(21)(a) (1984).

■ In interpreting a comprehensive legislative scheme, we must give meaning to all portions thereof and construe the statutory provisions to further the legislative intent. *Martinez v. Continental Enterprises,* 730 P.2d 308 (Colo.1986); *Johnston v. City Council,* 177 Colo. 223, 493 P.2d 651 (1972). A party challenging a tax assessment assumes the burden of establishing the invalidity of the assessment. *See, e.g., County Bd. of Equalization v. Board of Assessment Appeals,* 743 P.2d 444 (Colo.App.1987); *Majestic Great Western Sav. & Loan Ass'n v. Reale,* 30 Colo. App. 564, 499 P.2d 644 (1972).

The Code reflects a broad legislative intent to impose sales taxes or use taxes upon the great majority of purchases of tangible personal property. *See Rocky Mt. Prestress, Inc. v. Johnson,* 194 Colo. 560, 565, 574 P.2d 88, 91–92 (1978). The definition of retail sale is broadly inclusive, encompassing all sales except wholesale sales. The use tax is to be imposed on the purchase price of all tangible personal property that is purchased at retail for use, storage, distribution or consumption.

Hirschfeld argues that because the prepress materials became the property of customers and were paid for by customers, its purchases of those materials must be deemed purchases "for resale" within the definition of wholesale sale contained in section 53–95(21)(a) of the Code. Under Hirschfeld's view, any purchase of an item of tangible personal property that is ultimately resold would be exempt from the imposition of a use tax, no matter how long the item might be stored or how extensively the initial purchaser might make use of the item. If a purchase of property used, stored, distributed or consumed by an initial purchaser can be insulated from the imposition of a use tax simply because of a subsequent transfer of title to the property, the broadly inclusive purposes of the Code would be severely undermined. We reject this construction of section 53–95(21)(a) of the Code.

■ The structure and language of the code support adoption of a primary purpose test. The Code authorizes taxation of every purchase "at retail," and then defines retail sale to mean all sales other than wholesale sales *"for* resale" (emphasis added). Such language invites examination of

a purchase at the time it is made, while recognizing that in some circumstances events subsequent to the purchase may provide evidence of the true nature of the transaction. We thus conclude that, for purposes of the Code, a purchase of an item of tangible personal property is a purchase for resale and therefore not a purchase at retail if the primary purpose of the transaction is the acquisition of the item for resale in an unaltered condition and basically unused by the purchaser.

 This primary purpose standard does not emphasize the subjective intent of the purchaser, though evidence of such intent would no doubt be relevant in disputed cases. The standard does require inquiry into the actual conduct of a purchaser subsequent to a disputed purchase to ascertain by objective means the primary purpose of the transaction. Other factors to be considered in any such inquiry are: the nature of the purchaser's contractual obligations, if any, to use, alter or consume the property to produce goods or perform services; the degree to which the items in question are essential to the purchaser's performance of those obligations; the degree to which the purchaser controls the manner in which the items are used, altered or consumed prior to their transfer to third parties; and the degree to which the form, character or composition of the items when transferred to third parties differs from the form, character or composition of those items at the time they were initially purchased. Under this approach, an item of tangible personal property acquired primar-

ily for the purchaser's own use or consumption would be subject to the imposition of a use tax. If, however, a purchaser were to acquire an item of tangible personal property primarily for resale to another, no use tax could be imposed on the transaction even if the purchaser were to make minor use of the item.

The Court of Appeals adopted a primary purpose test in determining that Hirschfeld's purchases of pre-press materials were not purchases at wholesale for resale. Other courts construing sales tax and use tax statutes of other jurisdictions have developed similar standards to determine whether an item of personal property has been purchased for resale. *See Kaiser Steel Corp. v. State Bd. of Equalization,* 24 Cal.3d 188, 154 Cal.Rptr. 919, 593 P.2d 864 (1979); *Laux Advertising, Inc. v. Tully,* 67 A.D.2d 1066, 414 N.Y.S.2d 53 (1979); *Baltimore Foundry & Mach. Corp. v. Comptroller of State,* 211 Md. 316, 127 A.2d 368 (1956).

While this court has not extensively explored the definitions of retail sale and wholesale sale contained in the Code,[5] we have had occasion to comment upon almost identical language contained in comparable Colorado retail sales tax and use tax statutes. While those cases are by no means directly controlling, they offer some perspective on the issue.[6]

In *Bedford v. Colorado Fuel & Iron Corp.,* 102 Colo. 538, 81 P.2d 752 (1938), a company engaged in mining and manufacturing activities asserted, *inter alia,* that

---

**5.** In *Rocky Mountain Prestress, Inc., v. Johnson,* 194 Colo. 560, 574 P.2d 88 (1978), we determined that a construction company's importation of prestressed concrete forms fabricated by the company outside the City's retail sales tax jurisdiction for use by the company in construction projects did not constitute a retail purchase for purposes of use tax assessment under a prior version of the Code. We also concluded that a provision of the Code exempting a non-resident's purchase of tangible personal property "for his own use" from taxation applied only if the property were used for the purchaser's own "personal use." *See* Denver, Colo.Rev.Mun. Code §§ 166A.3–1(1), A.3–2(1), A.2–6 and A.3–3(7) (1976).

In *Gold Star Sausage Co. v. Kempf,* 679 P.2d 1116 (Colo.App.1984), the Court of Appeals held

that a meat product manufacturer's purchases of sausage casings were not exempt from the imposition of use taxes as wholesale purchases for resale under the definitions contained in the then applicable Denver Municipal Code. *See* Denver, Colo.Rev.Mun.Code §§ 166A.2–13, –14 (1964).

**6.** Section 39–26–202, 16B C.R.S. (1982), imposes a use tax "for the privilege of storing, using, or consuming ... any articles of tangible personal property purchased at retail." The term "retail sale," as applicable to the use tax statute, is defined in section 39–26–102(9), 16B C.R.S. (1982), to include "all sales ... except wholesale sales."

several purchases of personal property were exempt from taxation under the statutory provision relieving manufacturers from tax liability for purchases of property used in manufacturing processes.[7] In considering the meaning of the statutory exemption, we noted that the definitions of wholesale and retail sale established by the General Assembly differed from the "ordinarily accepted general conception" of those terms. *Id.*, 102 Colo. at 543, 81 P.2d at 754.[8] We also emphasized that the General Assembly had adopted a broad scheme that taxes "that which is consumed and used and exempts only that which is sold for resale," 102 Colo. at 543, 81 P.2d at 755, and observed that for purposes of the manufacturing exemption therein considered the manufacturer was the "ultimate consumer" of all items purchased and used in the manufacturing process. 102 Colo. at 543, 81 P.2d at 754. While *Bedford* is limited to questions arising under the statutory exemptions therein construed, its recognition of the broad scope of the retail sales tax and use tax statutes is compatible with the conclusion that the primary purpose of a purchase, as determined by objective criteria, determines whether the purchase is for resale.

In *Craftsman Painters & Decorators v. Carpenter*, 111 Colo. 1, 137 P.2d 414 (1942), we directly considered the definition of "retail sale" contained in the then applicable state retail sales tax statute.[9] In *Craftsman*, two contractors asserted that, contrary to the determination of the Colorado Director of Revenue, their purchases of paints and oils, finishes, wire, lighting fixtures and incidental materials used in the course of performing fixed-price electrical and painting contracts were purchases for resale and therefore not subject to the imposition of retail sales taxes. The items were used by the contractors in performing their contracts and ultimately became part of completed structures. We upheld the Director's determination in the following language:

> We think [the Director's] conclusion that when [the contractors] purchased the several items of personal property and built them into the structure as an integral part of their entire contract, and then disposed of the completed work to the owner, they were users and consumers and not retailers to the owner of each item, was not only a ruling within [the Director's] discretion, but is absolutely irrefutable on any basis of logical reasoning. . . .

*Id.*, 111 Colo. at 5–6, 137 P.2d at 416. *Craftsman* reinforced the views expressed in *Bedford v. Colorado Fuel & Iron Corp.*, 102 Colo. 538, 543, 81 P.2d 752, 755 (1938), to the effect that the statutory definition of retail sale encompasses a broad range of transactions. As the Court of Appeals noted in its opinion below, in *Craftsman* the fact that the contractors ultimately transferred title to the personalty to their customers pursuant to a fixed-price contract did not affect the conclusion that the purchases were not for resale. *A.B. Hirschfeld Press, Inc. v. Denver*, 779 P.2d 1356, 1359 (Colo.App.1988).

---

7. The Emergency Retail Sales Tax Act of 1935, ch. 230, §§ 1–43 1937 Colo.Sess.Laws 1075–1103, ch. 144, §§ 1–46, Colo.Stat.Ann. (1939 Supp.).

8. The Colorado retail sales tax and use tax statute differs from statutes of most other states. Many states have adopted retail sales tax and use tax statutes containing language similar to the language of New York's comparable statute, which defines "retail sale" as:

 a sale of tangible personal property for any purpose, other than ... for resale as such or as a physical component of part of tangible personal property, or ... for use by that person in performing the services subject to tax [under the act]. . . .

N.Y. Tax Law § 1101(b) (McKinney 1987). Other states have adopted the approach exemplified by the comparable California statute, which defines "retail sale" as simply "a sale for any purpose other than for resale in the regular course of business. . . ." Cal.Rev. & Tax Code § 6007 (West 1987). While the California statute does not define the term "resale," it does expressly provide that any use of tangible personal property for purposes other than storage or display by a purchaser who bought the property with a valid resale certificate is subject to a use tax levy. Cal.Rev. & Tax Code § 6094 (West 1987).

9. *See* ch. 144, §§ 1–46, Colo.Stat.Ann. 176–94 (1942 Supp.).

This court also considered the statutory definitions of retail sale and wholesale sale in *Carpenter v. Carman Distributing Co.*, 111 Colo. 566, 144 P.2d 770 (1943). In *Carman Co.*, a seller of tangible personal property claimed that certain sales of tangible personal property to laundries and cleaners were exempt from taxation under the manufacturing exemption contained in the Emergency Retail Sales Tax Act of 1935.[10] It also claimed that other sales of personalty were wholesale sales for resale as defined by that statute.[11] The laundries and cleaners then used those items in various ways to perform cleaning, ironing, pressing and repair services for their own customers.

We concluded that sales of such items as soaps, starches, alkalies and solvents did not satisfy the requirements of the claimed manufacturing exemption. We also held that sales of items used for repairs, such as cloths, fabrics, buttons and thread, or used to package garments for delivery, such as wrapping paper and twine, were not sales for resale. Observing that the statutory definitions of retail sale and wholesale sale are at variance with the generally accepted meanings of the terms, *Carman Co.*, 111 Colo. at 575, 144 P.2d at 773–74, we stated as follows:

> A purchaser may buy in large quantities what is commercially known as at "wholesale" and get wholesale prices and still the sale may not be exempt. Exemption depends entirely upon the disposition of a purchased product by the buyer. *Bedford v. C.F. & I. Corp., supra.* See, also, *Craftsman Painters & Decorators v. Carpenter*, 111 Colo. 1, 137 P.2d 414.

Our opinion in *Carman Co.* is consistent with our conclusion that the determination of whether a transaction constitutes a purchase for resale and is therefore not a purchase at retail as defined by the Code requires a determination of whether the item purchased is acquired primarily for resale in an unaltered condition and basically unused by the purchaser.

All of these decisions emphasize the broad sweep of the statutory definition of retail sale. They also suggest that the determination of whether a purchase is a purchase for resale requires application of the primary purpose standard that requires objective evaluation of a purchaser's conduct to determine the true nature of the transaction in question. A contrary view would introduce substantial subjectivity into determinations of what transactions are or are not subject to retail sales taxes or use taxes—a result to be avoided to ensure consistency and fairness in the imposition of such taxes. *See District 50 Metro. Recreation Dist. v. Burnside*, 167 Colo. 425, 448 P.2d 788 (1968).

In this case it is clear that Hirschfeld could not perform the services it was contractually obligated to perform for its customers without making extensive use of the pre-press materials. Furthermore, the manner and extent of Hirschfeld's use of the items was vested solely in Hirschfeld. Finally, Hirschfeld's customers acquired title to the items only after Hirschfeld had used and in most cases altered the pre-press materials. Thus, Hirschfeld made substantial use of the pre-press materials for its own direct and indirect benefit. The evidence amply supports the conclusion

---

**10.** As it then existed, the provision exempted:

[s]ales to and purchasers [sic] of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit or use, any article, substance or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded or furnished and the container, label, or the furnished shipping case thereof, shall be deemed wholesale sales and shall be exempt from taxation under articles 1 to 5 of this chapter.

Ch. 230, § 2(n) 1937 Colo.Sess.Laws 1078, ch. 144, § 2(n) Colo.Stat.Ann. 129 (1939 Supp.).

**11.** The statute contained the following relevant language:

The term "wholesale sale" means a sale by wholesalers to retail merchants, jobbers, dealers or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale; and the sales shall be deemed a retail sales, and subject to the provisions of this chapter.

Ch. 230, § 2(e) 1937 Colo.Sess.Laws 1076, ch. 144, § 2(e) Colo.Stat.Ann. 128 (1939 Supp.).

that the pre-press materials were purchased primarily for Hirschfeld's use in performing its contractual obligations rather than for resale to its customers.

Hirschfeld argues that because it in fact ultimately resold the pre-press materials to various customers, the materials were purchased for "resale" within the meaning of section 53–95(21)(a) of the Code. Adoption of that view would render the use tax provisions of the Code meaningless. *See Bedford v. Colorado Fuel & Iron Corp.*, 102 Colo. 538, 543, 81 P.2d 752, 755. Hirschfeld substantially used and often altered the pre-press materials in performing its contractual obligations to its customers. It is Hirschfeld's use of the items, not its ultimate transfer of title thereto to its customers, that is pertinent to the determination of the primary purpose for which the items were acquired. *See Howard Elec. and Mech., Inc. v. Department of Revenue*, 771 P.2d 475, 477 (Colo.1989); *Tri-State Generation & Transmission Ass'n, Inc. v. Department of Revenue*, 636 P.2d 1335, 1337 (Colo.App.1981); *Carpenter v. Carman Distrib. Co.*, 111 Colo. 566, 575, 144 P.2d 770, 773–74 (1943).

Hirschfeld relies on three decisions rendered by the Georgia Court of Appeals to support its argument. In *Superior Type, Inc. v. Williams*, 98 Ga.App. 89, 105 S.E.2d 14 (1958), the court held in three consolidated cases that in the circumstances of those cases purchases by commercial printers of metal type, lithographs and photoengraving plates constituted purchases of personal services rather than purchases of tangible personal property. Under relevant Georgia statutory provisions, purchases of personal services are not subject to the imposition of retail sales taxes. The printer either furnished the metal used by the typesetter or replaced metal furnished by the typesetter with an equivalent amount of metal. In *Hawes v. Higgins–McArthur Co.*, 117 Ga.App. 738, 161 S.E.2d 915 (1968), and *Undercofler v. Foote & Davies, Inc.*, 115 Ga.App. 341, 154 S.E.2d 454 (1967), other panels of the Georgia Court of Appeals concluded that *Superior Type, Inc.* precluded imposition of retail sales taxes or use taxes on similar transactions involving commercial printers. Those cases construe and apply provisions of Georgia's statutory scheme of retail sales tax and use tax assessments that distinguish between purchases of services and purchases of tangible personal property. *See* Ga.Code Ann. Supp. §§ 92–3403a(E), 92–3403a(B), and 92–3403a(C)(2)(a). As adopted by the City and County of Denver, the Code makes no such distinctions.

The Code authorizes the imposition of retail sales taxes or use taxes in language that broadly includes any transaction not exempt as a purchase for resale. A purchase of an item of tangible personal property is one for resale only if the primary purpose of the transaction is the acquisition of the item for resale in an unaltered condition and basically unused. Because Hirschfeld acquired the pre-press materials primarily for its own use and not for resale, the purchases were purchases at retail and therefore subject to imposition of use taxes.

IV

Hirschfeld asserts that imposition of use taxes on the purchases of the pre-press materials results in double taxation when the items are resold to Hirschfeld's customers. We disagree.

While this court has recognized that double taxation should be avoided, *People v. Texas Co.*, 85 Colo. 289, 275 P. 896 (1929), Hirschfeld's argument ignores the fact that use taxes imposed on the pre-press materials would reflect different transactions and different taxable events. The mere pyramiding of taxes on an item as it flows through commercial channels does not in itself constitute double taxation. *Bedford v. Colorado Fuel & Iron Corp.*, 102 Colo. at 544, 81 P.2d at 755; *State Dept. of Revenue v. Adolph Coors Co.*, 724 P.2d 1341 (1986); *Bedford v. Hartman Bros.*, 104 Colo. 190, 89 P.2d 584 (1939); *see* L. Moak & F. Cowan, *Administration of Local Sales and Use Taxes* 16 (1961). The imposition of use taxes on Hirschfeld's purchases of the pre-press materials and the imposition of retail sales

taxes on Hirschfeld's subsequent sales of those materials to its customers constitute separate assessments for separate transactions. No double taxation results in the context of this case.

Hirschfeld also contends that this court's decisions in *International Business Machines Corp. v. Charnes*, 198 Colo. 374, 601 P.2d 622 (1979), and *C.F. & I. Steel Corp. v. Charnes*, 637 P.2d 324 (Colo.1981), require adoption of the statutory construction it urges here. We disagree.

In *International Business Machines Corp.*, the Colorado Director of Revenue sought to impose a use tax on the full capitalized cost of items of tangible personal property purchased by a manufacturer of business equipment for the company's inventory of goods to be sold, but later withdrawn from inventory and put to its own use. It was conceded that the initial purchases were exempt from taxation as component parts, pursuant to section 39–26–203(1)(f), 16 C.R.S. (1973). The manufacturer also conceded that the items were subject to the imposition of a use tax, but protested the Director's determination that the use tax should be based on the enhanced value of those items after they were manufactured, assembled and integrated into the final product.

We agreed with the manufacturer, holding that the use tax was applicable only to the value of the items at the time the manufacturer initially purchased them. In so doing, we recognized that a purchaser's ultimate use and disposition of property could affect the classification of the initial purchase of that property as a wholesale or a retail sale. *Id.* 601 P.2d at 625. Our concern was not whether the Director's interpretation would amount to "double taxation," as Hirschfeld argues here, but whether it would constitute a value-added tax, in contravention of the purpose of the statutory provisions to equalize tax burdens. *Id.* at 624, 625.

In *C.F. & I. Steel Corp. v. Charnes*, this court reviewed the propriety of the Colorado Director of Revenue's imposition of a use tax on purchases of specific items used by a company in its manufacturing processes.[12] Each such item was created by the company from raw materials purchased for its general steel making processes, used in various aspects of those processes until the expiration of its useful life, and then melted down and returned to the general steel making processes as scrap metal.

The Director initially contended that the use taxes should be imposed on the value of the items created by the company because the company in fact used those items. We rejected that argument on the ground that the use tax statute does not apply to items created by a manufacturer, noting that a contrary ruling would sanction imposition of value-added taxes. 637 P.2d at 330.

The Director argued in the alternative that the diversion of the raw materials used to create the crafted items from the company's normal manufacturing process constituted a taxable event. We rejected that argument on the grounds that the quantity of the materials actually diverted was necessarily speculative and that the diversion constituted but a "brief utilization" of the materials prior to their "eventual use in the steel-making process and consequent consumption into the finished steel product." *Id.* In this case, the pre-press materials did not consist of raw products temporarily diverted from, and then returned in their initial state to, Hirschfeld's manufacturing process. It is undisputed that Hirschfeld's purchases of the pre-press materials constituted the taxable events at issue here.

V

The question of whether Hirschfeld's purchases of pre-press materials were purchases for resale, and therefore not subject to the imposition of use taxes under the Code, is answered in the negative. The primary purpose of the transactions was the acquisition of pre-press materials for Hirschfeld's use in performing its contractual obligations, not for resale to its customers unaltered and basically unused.

12. The items in question included molds, stools, cinder pots and pig machine molds.

Hirschfeld does not claim that the purchases were exempt from the imposition of use taxes under any provision of the Code other than the provisions defining retail sale and wholesale sale. The Director therefore properly imposed use taxes on the purchases of the pre-press materials.

The judgment of the Court of Appeals is affirmed.

ERICKSON, J., dissents.

Justice ERICKSON dissenting:

The issue in this case is whether section 53–91 to –97 of the Revised Municipal Code of the City and County of Denver authorizes the Denver Department of Revenue to impose a use tax on a commercial lithographer's purchase of pre-press materials necessary for the production of custom printed products. The majority concludes that pre-press materials are subject to the municipal use tax. I disagree. Because pre-press materials are purchased for resale, they are not within the category of personal property upon which a use tax may be levied. To impose a use tax upon pre-press materials in addition to the sales tax imposed upon the resale of those materials results in double taxation and is incompatible with Colorado law.

## I

Hirschfeld is a commercial lithographer whose business consists primarily of printing brochures, letterheads, and greeting cards utilizing the photo-offset process. Pre-press materials include film, positives, negatives, unexposed plates, transparencies, photos, and color separations used to create printing plates and are equivalent to engraved plates that printers use and deliver to their customers with their engraved products. Hirschfeld purchases pre-press materials from local wholesale dealers.

Pre-press materials are purchased as general manufacturing material by the lithographer and transformed into a customized product for a particular customer.

The process is described in detail in the briefs. The image to be printed is photographed and the exposed film is developed. The negatives or color separations are incorporated into flats through the utilization of stripping materials that are typically composed of mylar and other plastic sheets. The flats orient the various negatives and transparencies into the images for print. Proofs are then created by exposing the flats to light sensitive proofing materials. The flats are then placed over unexposed plates, which are a thin sheet of aluminum treated with a polymer emulsion. The plates are then exposed to light and developed in chemicals that remove the polymer coating. The removal of the polymer coating creates areas on the plates that are receptive to ink. The plates are then attached to a drum on an off-set printing press. The image areas on the plates retain ink from a printing solution, which is subsequently transferred to paper as the drum rotates and the pre-press plates print the final product.

Hirschfeld collects and remits sales taxes for both the pre-press materials and the final printed product. Hirschfeld's customers have title to, and often take delivery of, the pre-press materials.[1] Hirschfeld's customers often use pre-press materials, such as the plates, for successive printing runs. The existing flats may be modified to incorporate changes requested by the customer for later printing orders. Some of Hirschfeld's customers take delivery of their pre-press materials and ship them to offshore production facilities where off-setting work can be done at lower labor costs.

## II

Section 53–96 of the Revised Municipal Code of the City and County of Denver provides that:

There is levied and there shall be collected and paid a tax in the amount stated in this article, by every person exercising the taxable privilege of storing, using, distributing, or consuming in the city a

---

1. Some of the pre-press materials such as film are consumed during the production process and therefore cannot be delivered to the cus-

tomer. Such materials fall within the manufacturing exception to the use tax. Denver Code § 93–95(21)(b).

service subject to the provisions of this article or any article of tangible personal property, *purchased at retail,* for said exercise of said privilege....

(Emphasis added.) The legislative intent of the use tax is that "every person who stores, uses, distributes or consumes in the city any article of tangible personal property ... *purchased at retail,* is exercising a taxable privilege." Denver Code, § 53–92 (emphasis added).

The authority to impose a use tax is dependent on the threshold question whether the item of personal property is purchased at retail. If the item of personal property is not purchased at retail, then the department of revenue has no authority to impose a use tax regardless of the extent of storage, use, or consumption of that item. Section 53–95(12) defines a retail sale as "any sale, as defined in this section, except a wholesale sale." A wholesale sale is defined as, "A sale by a wholesaler to licensed retail merchants, jobbers, dealers or other wholesalers *for resale....*" Denver Code § 53–95(21) (emphasis added).

If an item of personal property is purchased from a wholesaler for the purpose of resale, then it is not a retail purchase, and the Denver Department of Revenue has no authority to levy a use tax upon that item. Because the statutory definition of wholesale is clear and unambiguous, there is no need or justification for the judicial creation of a standard to determine the primary purpose of a purchase based upon the degree of use by the original purchaser. The only question which need be addressed by this court is whether the materials purchased by Hirschfeld were resold.

The dual nature of pre-press materials creates some confusion as to whether they are purchased at wholesale for resale or whether they are purchased at retail for the purpose of manufacturing a final prod-uct. Pre-press materials are essential to the production of the final lithograph ordered by the customer. However, pre-press materials are also a product that has substantial value.

The majority focuses on the role of pre-press materials in manufacturing the printed product, and has concluded that because pre-press materials are used for the production of a lithograph, they are subject to the use tax. In coming to that conclusion, the majority fails to address the threshold question of whether the pre-press materials are also purchased for resale. The majority has misinterpreted the municipal ordinance to read that the definition of wholesale is solely for resale and not for any intermediate use. Such an interpretation violates the general rule in Colorado that "tax statutes will not be extended beyond the clear import of the language used, nor will the operation be extended by analogy.... All doubt will be construed against the government in favor of the taxpayer." *Transponder Corp. v. Property Tax Admin.,* 681 P.2d 499, 504 (Colo.1984); *see also Catholic Archdiocese v. City of Denver,* 741 P.2d 333 (Colo.1987).

Colorado recognizes the potential for confusion resulting from the dual nature of pre-press materials and has therefore promulgated Colorado Sales and Use Tax Regulation No. 37, which states that, "Pre-press preparation materials ... shall qualify as exempt purchases of tangible personal property to the extent such items are utilized for the production of a specific product for a specific customer and title passes to the customer as part of the total sale...." *Printers and Printing,* State Tax Reporter, Colorado (CCH) ¶ 60–152 (1986). Pre-press materials are also exempted from sales or use tax in Georgia,[2] Idaho,[3] Iowa,[4] Louisiana,[5] Maryland,[6] Minnesota,[7] Mississippi,[8] New Jersey,[9] New

---

**2.** *Hawes v. Higgins–McArthur Co.,* 117 Ga.App. 738, 161 S.E.2d 915 (1968).

**3.** All St. Sales Tax Rep. (CCH) ¶ 33–540 (1989).

**4.** All St. Sales Tax Rep. (CCH) ¶ 33–046u (1989).

**5.** All St. Sales Tax Rep. (CCH) ¶ 7–350.23 (1989).

**6.** All St. Sales Tax Rep. (CCH) ¶ 7–350.25 (1989).

**7.** All St. Sales Tax Rep. (CCH) ¶ 45–363 (1984).

**8.** All St. Sales Tax Rep. (CCH) ¶ 46–551 (1988).

**9.** All St. Sales Tax Rep. (CCH) ¶ 7–350.35 (1989).

York,[10] Tennessee,[11] and Virginia.[12]

## III

The purpose of the use tax is to supplement the sales tax, and therefore should not apply to property subject to sales tax. *State Dep't of Rev. v. Adolph Coors Co.,* 724 P.2d 1341, 1344 (Colo.1986); *see also,* § 39–26–203(1)(a), 16B C.R.S. (1982). The use tax "was designed to apply to the use and consumption of commodities elsewhere purchased at retail, which, if purchased in Colorado, would have been subject to the sales tax." *Bedford v. Colorado Fuel and Iron Corp.,* 102 Colo. 538, 540, 81 P.2d 752, 753 (1938). As this court observed in *State Department of Revenue v. Adolph Coors Co.,* "Because the sales and use taxing schemes are designed to complement each other, provisions of one should be interpreted in harmony with provisions of the other." 724 P.2d at 1344. Hirschfeld's customers pay sales tax on both the final printed product and on the pre-press materials, and the imposition of an additional use tax would be incongruous with the design and intent of Colorado's retail tax structure.

The majority relies on *Carpenter v. Carman Distributing Co.,* 111 Colo. 566, 144 P.2d 770 (1943), and *Craftsman Painters & Decorators v. Carpenter,* 111 Colo. 1, 137 P.2d 414 (1943), in support of its conclusion that the statutory definition of a retail sale is quite broad and encompasses any significant use by the manufacturer. *Carman* involved fabrics, threads, and buttons used as a matter of course by laundries in repairing garments. We relied on the fact that the price of the laundry services was the same whether or not repairs were made. *Carman,* 111 Colo. at 569–70, 144 P.2d at 771–73. The laundry was properly responsible for a use tax, since it was the ultimate consumer of the goods, charging no sales tax on the final transaction directly related to the fabrics, thread, and buttons. *Carman,* 111 Colo. at 577, 144 P.2d at 774.

In *Craftsman Painters,* which dealt with paint and electrical wiring used by a contractor, we did not indicate whether the price charged to the ultimate consumer was affected by the cost of the paint and wiring or whether the ultimate transaction was subject to a tax. Since the materials became part of the realty, it is highly unlikely that they would have been subject to a sales tax, as a sales tax may only be levied on personal property. The contractor was thus the ultimate consumer of the materials and was properly required to pay a use tax. Here, Hirschfeld is not the ultimate consumer, and properly charges a sales tax on both the printed matter and the pre-press materials.

The imposition of a use tax for pre-press materials in addition to the sales tax already collected is improper as double taxation. In *IBM v. Charnes,* 198 Colo. 374, 376, 601 P.2d 622, 625 (1979), we imposed a use tax on items purchased at wholesale but permanently diverted to IBM's own use. In coming to this conclusion, we enunciated the following rule: "Exemption of intermediate sales from use tax is designed to avoid multiple taxation, the goal being to impose the sales or use tax on the final, consumptive transaction." *Id.* at 378, 601 P.2d at 625.

The majority states that the taxes imposed on the pre-press materials reflect different transactions and different taxable events, and that a use tax is proper. In coming to this conclusion, the majority reasons that Hirschfeld is using the pre-press materials for a separate and distinct purpose other than that of its customer. Pre-press materials serve only one purpose, to create plates necessary for the reproduction of customized printed material for an individual customer. The pre-press materials to the lithographer are as essential to the sale of the final printed product as a container is to a brewer of beer. *See State*

---

**10.** All St. Sales Tax Rep. (CCH) ¶ 7–350.37 (1989).

**11.** All St. Sales Tax Rep. (CCH) ¶ 7–350.48 (1989).

**12.** All St. Sales Tax Rep. (CCH) ¶ 73–586 (1987).

*Dep't of Revenue v. Adolph Coors Co.*, 724 P.2d at 1345. Hirschfeld may use the pre-press materials, but it uses them to create the product ordered by the customer, and not for any other independent purpose or benefit.

I respectfully dissent.