The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 4, 2018

**2018COA147**

**No. 17CA1605 Big Sur Waterbeds v. City of Lakewood —
Taxation — Sales and Use Tax**

The City of Lakewood imposes use tax on tangible personal property purchased at retail and used in the city. The use tax does not apply to wholesale purchases (i.e., purchases for resale to others). A division of the Colorado Court of Appeals considers whether Lakewood properly imposed use tax on certain purchases of property by furniture retailers from furniture wholesalers. Specifically, Lakewood assessed use tax on furniture that the retailers displayed on their showroom floors for their customers to peruse and try out. The retailers ultimately sold all displayed furniture to customers, who paid Lakewood's sales tax on the sales.

The division holds that Lakewood's use tax does not apply to the retailers' purchases and minor use of the furniture for display

because the primary purpose of those purchases was to resell that furniture.  As a result, the division affirms the district court's judgment cancelling the tax assessments.

COLORADO COURT OF APPEALS                                    2018COA147

_____

Court of Appeals No. 17CA1605
Jefferson County District Court No. 16CV30877
Honorable Laura A. Tighe, Judge

_____

Big Sur Waterbeds, Inc.; Denver Mattress Company, LLC; and Sofa Mart, LLC,

Plaintiffs-Appellees,

v.

City of Lakewood, Colorado; and Larry Dorr, in his official capacity as Finance
Director of the City of Lakewood, Colorado,

Defendants-Appellants.

_____

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE NAVARRO
J. Jones and Kapelke*, JJ., concur

Announced October 4, 2018

_____

Silverstein & Pomerantz LLP, Neil I. Pomerantz, Mark E. Medina, Michelle
Bush, Denver, Colorado, for Plaintiffs-Appellees

Hoffman, Parker, Wilson & Carberry, P.C., M. Patrick Wilson, M. Keith Martin,
Denver, Colorado, for Defendants-Appellants


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1    Plaintiffs, Big Sur Waterbeds, Inc., Denver Mattress Co., LLC, and Sofa Mart, LLC, purchase furniture (tax free) from wholesalers worldwide and resell it in stores across the country, including in the City of Lakewood.  At each Lakewood store, plaintiffs provide a showroom in which they display some furniture for customers to peruse and try out.  Plaintiffs also maintain warehouses, where they store the bulk of their inventory.  They ultimately sell all the furniture — including the displayed furniture — and fill customer orders from either the warehouses or the showrooms.  Plaintiffs' customers pay Lakewood's sales tax on each purchase.

¶ 2    Lakewood assessed use tax on plaintiffs' purchases of the displayed furniture from 2012 to 2015, on the theory that plaintiffs purchased the displayed furniture *at retail* for their own use in advertising their products.  Plaintiffs challenged the assessments in the district court, which held a bench trial.  They argued that, like all the furniture they buy, they purchased the displayed furniture *at wholesale* — that is, primarily for resale — and thus those purchases were exempt from use tax.  Employing the "primary purpose" test from *A.B. Hirschfeld Press, Inc. v. City and County of Denver*, 806 P.2d 917, 918-26 (Colo. 1991), the court agreed with

1

plaintiffs and cancelled Lakewood's use tax assessments. Addressing an issue of first impression, we also conclude that plaintiffs purchased the displayed furniture primarily for resale. Therefore, we affirm the judgment cancelling the assessments.

## I. Standard of Review

¶ 3 We review de novo a district court's interpretation of a tax code. *Leggett & Platt, Inc. v. Ostrom*, 251 P.3d 1135, 1140 (Colo. App. 2010). Generally, when interpreting tax provisions, we resolve doubts in favor of the taxpayer. *Noble Energy, Inc. v. Colo. Dep't of Revenue*, 232 P.3d 293, 296 (Colo. App. 2010). When a taxpayer claims a statutory exemption from taxation, however, we presume that taxation is the rule and resolve doubts in favor of the taxing authority. *Id.*

¶ 4 "Following a bench trial, we defer to a trial court's factual findings unless they are so clearly erroneous as to find no support in the record." *Target Corp. v. Prestige Maint. USA, Ltd.*, 2013 COA 12, ¶ 24.

## II. Lakewood's Code and Regulations

¶ 5 Lakewood's municipal code imposes a three percent use tax "for the privilege of storing, using, or consuming in the City any

articles of tangible personal property or taxable services purchased *at retail.*"  Lakewood Mun. Code 3.01.210 (emphasis added).  The use tax does not apply if the purchaser has already paid sales tax on the item, either to Lakewood or to another municipality, in an amount equal to or greater than the amount of Lakewood's tax.  *Id.* at 3.01.220(A)(1), (E).

¶ 6        "Retail sale" is defined as "all sales except wholesale sales made within the city."  *Id.* at 3.01.020.  A "[w]holesale sale" is "a sale by wholesalers to retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers not for resale . . . ."  *Id.*

¶ 7        Consistent with the definitions of retail sale and wholesale sale, the code also expressly exempts from use tax "the storage, use, or consumption of any tangible personal property purchased for resale in the city, either in its original form or as an ingredient of a manufactured or compounded product, in the regular course of a business."  *Id.* at 3.01.230(B).[1]

─────────────

[1] This code provision *exempting* property from use tax mirrors the provision *imposing* use tax: both provide that use tax does not apply to wholesale sales (i.e., purchases for resale).  The parties disagree, therefore, about whether this case presents a tax-imposition

3

¶ 8    Lakewood's sales and use tax regulations supply guidance on interpreting the code.  *See id.* at 3.01.070 ("The City Council shall adopt rules and regulations in conformity with this chapter for the proper administration and enforcement of this chapter.").  One such regulation explains that "[u]se tax is a complement to sales tax." Lakewood Sales and Use Tax Reg. 3.01.300(1)(b) (adopted June 24, 1985), https://perma.cc/2LGV-L4B7.[2]  Because sales tax is imposed only on retail sales, which are sales to the user or consumer of property or services sold, "use tax shall not apply to the storage, use[,] or consumption of tangible personal property purchased by a licensed retailer for resale within the regular course of a business."  *Id.*

---

dispute (requiring doubts to be resolved against taxation) or a tax-exemption dispute (requiring doubts to be resolved in favor of taxation).  We need not settle this disagreement.  Even assuming that plaintiffs claim an exemption, they should prevail because they are clearly entitled to the exemption, as we will explain.

[2] We apply this version of the regulations because it was admitted into evidence at trial without objection.  *See Alpenhoff LLC v. City of Ouray*, 2013 COA 9, ¶ 10 ("[A]ppellate review extends only to those [municipal] code provisions included in the record.").  While these regulations have apparently been amended since their 1985 adoption, *see* Lakewood Sales and Use Tax Rules, Regs. & Special Regs. (amended effective June 12, 1993 and revised Oct. 21, 1994), https://perma.cc/SG2X-WV4L, the relevant regulatory language discussed in this opinion has not changed.

¶ 9    Regulation 3.01.300(1)(b) also cautions, however, that

> [t]angible personal property that was purchased tax-free for resale or as an ingredient of a manufactured or compounded product *and subsequently withdrawn from stock for the purchaser's own use or consumption* shall be taxed at the acquisition cost of all materials.  The tax liability attaches at the time that the tangible personal property is withdrawn from stock.

*Id.* (emphasis added).

¶ 10    In addition, a special regulation entitled "Initial Use of Property" states:

> Any item purchased for use or consumption by the purchaser is subject to sales or use tax at the time of purchase, even though the item shall be resold later in either its original or altered form.  A tax-free purchase is taxable in full at the first time it is used by the purchaser for a nonexempt purpose.
>
> (Example: A junkman may not buy a new car tax-free under the theory that the car is going to be junked someday and resold through his business for scrap.)

Lakewood Sales and Use Tax Special Regs., at 41.

### III.    Purchased "At Retail" or "At Wholesale?"

¶ 11    Lakewood contends that plaintiffs' "initial purchase and subsequent use of display furniture is a taxable event."  According to Lakewood, "all of [plaintiffs'] inventory purchases were initially

5

treated as exempt wholesale purchases for resale." But "[l]ater, when [plaintiffs] withdrew a portion of this wholesale inventory for use as demonstration and promotion tools, the transactions in which the display models were purchased were properly *recharacterized* as taxable retail transactions."

¶ 12    For its taxation theory, Lakewood relies on the Initial Use of Property special regulation as well as regulation 3.01.300(1)(b). Respectively, those regulations ask whether the displayed furniture was (1) primarily purchased for use, not for resale; or (2) purchased for resale initially but later withdrawn from stock for plaintiffs' own use (i.e., whether their placing the furniture on display revealed that the primary purpose of their purchase was for their own use rather than for resale). Because both regulations turn on plaintiffs' primary purpose, we first look to the *Hirschfeld* test.

A.    The Primary Purpose Test

¶ 13    In *Hirschfeld*, 806 P.2d at 918-26, the supreme court considered use tax provisions from Denver's tax code that are nearly identical to Lakewood's code. The supreme court explained that, in assessing whether a purchase was made "at retail" or "for resale," courts should apply "a primary purpose" test. *Id.* at 921.

Under this test, "a purchase of an item of tangible personal property is a purchase for resale and therefore not a purchase at retail if the primary purpose of the transaction is the acquisition of the item for resale in an unaltered condition and basically unused by the purchaser." *Id.* Five factors inform this determination:

1) "the actual conduct of a purchaser subsequent to a disputed purchase," *id.*;

2) "the nature of the purchaser's contractual obligations, if any, to use, alter[,] or consume the property to produce goods or perform services," *id.*;

3) "the degree to which the items in question are essential to the purchaser's performance of those obligations," *id.*;

4) "the degree to which the purchaser controls the manner in which the items are used, altered[,] or consumed prior to their transfer to third parties," *id.*; and

5) "the degree to which the form, character[,] or composition of the items when transferred to third parties differs from the form, character[,] or

7

composition of those items at the time they were initially purchased," *id.*

¶ 14    If, after considering these factors, a court concludes that the purchaser acquired the property at issue primarily for resale in an unaltered condition and basically unused, the use tax cannot apply "even if the purchaser were to make minor use of the item." *Id.*; *see also Coors Brewing Co. v. City of Golden*, 2013 COA 92, ¶ 48 (concluding that Coors purchased scrap metal primarily for resale even where it made "minor use" of the scrap during the manufacturing process). This recognition that minor use does not trigger a use tax comports with Lakewood's code, which exempts property purchased for resale even if it is used to some extent. *See* Lakewood Mun. Code 3.01.230(B) (Use tax shall not apply to "the storage, use, or consumption of any tangible personal property purchased for resale . . . .").

## B.    Additional Background

¶ 15    In each showroom, plaintiffs typically displayed samples of each item of furniture available for purchase. They stored the rest of their inventory in warehouses attached to the showrooms or in larger distribution centers in Denver and Aurora. Customers

perusing the showrooms were invited to try out the furniture by, for example, sitting on couches, turning on lamps, or lying on beds. At all times, including at the time plaintiffs purchased the furniture from wholesalers, plaintiffs intended to sell all the furniture — including the displayed furniture.

¶ 16    Following a three-day bench trial, the district court made extensive factual findings. It found that all of plaintiffs' floor furniture was always available for sale at the discretion of plaintiffs' employees. Although employees generally preferred to fill orders from the warehouses instead of from the showroom floors, employees "often [sold] floor model items" in certain situations. Those situations included

> (a) when a customer indicate[d] an immediate need for the item; (b) when the item on display [was] discontinued or "rotated" pursuant to a pre-determined schedule; (c) when the store manager desire[d] to change the furniture being displayed on the showroom floor; (d) where the item on display [was] a one-of-a-kind item (e.g., furniture using reclaimed wood); (e) when the furniture on display [was] needed to provide furniture to a customer who received a damaged or defective item upon delivery; and (f) where the item [was] characterized as "home décor" or an accessory item.

The court found that, when employees chose not to sell floor model items, "it was not because these items were not for sale; it was because they do not want to spend the time to replace a floor model, and they 'don't like to have a gap on the floor' that would cause them to miss a sale."

¶ 17     The court further found that displayed items remained on the showroom floor for an average of six to twelve months. Roughly 40% of the displayed items were sold within the first six months, and about 30% remained on the floor longer than one year. The court explained that "[a]ll of [the] floor models are eventually sold," a fact Lakewood did not dispute.

¶ 18     Regarding price, the court determined that "floor model items were often sold at full sales price where a customer exhibited an immediate need for the item." Also, "discounts up to 50% or more were common on warehouse items and floor models alike." Overall, the court found "no meaningful difference between the frequency and size of the discounts on floor models and the discounts on warehouse items."

¶ 19    As for tax treatment, "[plaintiffs] did not depreciate any of the floor model items for income tax, accounting, or financial reporting purposes."

¶ 20    Of the plaintiffs, only Denver Mattress was obligated by contract to take any action regarding the furniture. Denver Mattress agreed "to reserve a number of 'slots' on its showroom floor for [certain] vendors' mattresses and to give the vendors' products fair placement on the showroom floor."

¶ 21    The court outlined the procedures plaintiffs employed to display products on the showroom floors:

- "Un-boxing or un-wrapping the product."

- "Assembling tables, beds, desks, and other items (attaching table and sofa legs, installing knobs, connecting footboards/headboards, building chairs, and plugging in adjustable bases)."

- "'Breaking in' the cushions and pillows on sofas and chairs."

- "For overhead light fixtures and lamps, hard-wiring to the building's electrical system and installing lightbulbs."

- "For mattresses, trimming threads remaining from the manufacturing process and installing a 'shoe protector' at the foot of the mattress."

- "Staging the display models in 'vignettes' with other furniture and home décor or accessories to mimic a real living room."

The court reviewed witness testimony and found that, although plaintiffs often changed the "packaging" of their inventory to prepare it for the showroom, the showroom furniture was "well-maintained and kept in a like-new condition."

¶ 22    The court then applied the *Hirschfeld* test and concluded that plaintiffs purchased the displayed furniture primarily for resale.

### C.    Application of the Primary Purpose Test

¶ 23    Lakewood does not challenge any of the district court's factual findings as clearly erroneous. So, we accept them all. We review de novo the application of the *Hirschfeld* primary purpose test to those facts. *See Conoco, Inc. v. Tinklenberg*, 121 P.3d 893, 896 (Colo. App. 2005); *see also Coors*, ¶ 42.

### 1. Plaintiffs' Actual Conduct Following the Purchase of the Furniture

¶ 24    Plaintiffs purchased large quantities of furniture, all of which they intended to — and did — sell.  Plaintiffs selected a sampling of their inventory to display in their showrooms for customers to try out before purchasing.  As the district court noted, plaintiffs' conduct demonstrated that the "primary and overriding concern in [their] treatment of [the] floor models" was to preserve the marketability of the displayed furniture because all inventory would eventually be sold.

¶ 25    When customers purchased furniture, their orders were filled from the warehouse or, sometimes, directly from the showroom floor.  Customers paid sales tax on all purchases.

¶ 26    Plaintiffs treated the displayed furniture as inventory for income tax, accounting, and financial reporting purposes.  Thus, they did not derive any of the tax benefits, such as depreciation, that could have come with non-inventory status.

¶ 27    We conclude that the totality of plaintiffs' actual conduct shows that they purchased the displayed furniture primarily for resale in an unaltered condition and basically unused.  The fact

that plaintiffs permitted customers to view and try out the displayed furniture before it was sold does not indicate otherwise.

¶ 28    Lakewood stresses that the furniture remained on the floor for an average of six to twelve months, and sometimes longer. For a couple of reasons, however, the length of time the furniture stayed on the floor is not especially illuminating. First, Lakewood's emphasis on time seems inconsistent with its taxation theory — i.e., once plaintiffs removed the furniture from the warehouse and displayed it on the showroom floor to promote the product, a taxable event occurred. The length of time the furniture remained on the floor appears to be immaterial under this theory.

¶ 29    Second, the evidence did not show that any furniture item remained on the showroom floor longer, on average, than a similar item remained in the warehouse. The evidence did not reveal how long furniture stayed in the warehouse on average. The testimony showed, however, that furniture sometimes stayed in the warehouse for six to twelve months, or longer. And Lakewood did not assess use tax on warehouse items, no matter how long they remained. True, evidence indicated that many more items were sold from the warehouses than from the showrooms. But this fact simply reflects

14

that many more items were stored in the warehouses than in the showrooms and that plaintiffs' employees generally preferred to sell warehouse items first so they would not need to replace the furniture on the floor.

¶ 30    Hence, more significant than the time spent on the showroom floor is whether the displayed furniture was for resale and was sold in an unaltered condition and basically unused.[3]  The record demonstrates that the furniture was for resale while on the floor, it was sold in essentially new condition, and displaying the furniture for advertising was therefore a minor use that furthered the resale purpose.  *See Coors,* ¶¶ 54-57 (concluding that purchase of scrap aluminum was primarily for resale where Coors used the scrap "only fleetingly" in the manufacturing process); *see also C. F. & I. Steel Corp. v. Charnes,* 637 P.2d 324, 330 (Colo. 1981) (concluding that no taxable event occurred where steel corporation "brief[ly] utiliz[ed]" raw materials by diverting them "to its own temporary use and then back to the normal steel-making process").

---

[3] Illustrating this point is Lakewood's treatment of certain "out-the-door" items in the showroom, which consisted of small merchandise that was regularly sold from the floor (e.g., vases and pillows). Lakewood excluded those items from use tax no matter how long they remained on the floor because they were always for resale.

## 2. Plaintiffs' Contractual Obligations to Use, Alter, or Consume the Furniture to Produce Goods or Perform Services

¶ 31    Plaintiffs' only contractual obligation regarding the displayed furniture was Denver Mattress's duty to give fair placement on the showroom floor to some vendors' mattresses.  As the district court explained, "[T]hese contractual obligations related only to prominent placement on the showroom floor; not to committing Denver Mattress to any manner of usage, alteration, or consumption that differed from its treatment of other floor models not governed by the contract."  Beyond prominent floor placement, those obligations did not require any use.

¶ 32    In contrast, in *Hirschfeld*, a printing company purchased pre-press materials — such as printing plates, film, and transparencies — for use in printing brochures, letterheads, and greeting cards for its customers.  806 P.2d at 918.  In holding that the company's purchase of these materials was subject to the use tax, the supreme court noted, "[I]t is clear that Hirschfeld could not perform the services it was contractually obligated to perform for its customers without making extensive use of the pre-press materials."  *Id.* at 923.  "Hirschfeld substantially used and often altered the pre-press

materials in performing its contractual obligations to its *customers*." *Id.* at 924 (emphasis added).

¶ 33 Plaintiffs here had no contractual obligations to their *customers* to display the furniture. At most, one plaintiff had obligations to certain *vendors* as to some products. So, unlike in *Hirschfeld*, plaintiffs had no contractual obligations to customers that would require them to use, alter, or consume any furniture to produce goods or perform services. *Cf. City of Colorado Springs v. Inv. Hotel Props., Ltd.*, 806 P.2d 375, 379 (Colo. 1991) (holding that primary purpose of hotel's purchase of guest room furniture was for the hotel's "use thereof in fulfilling its contractual obligations to its guests").

¶ 34 Lakewood argues that, because this case arose in the retail context as opposed to the manufacturing context, "some deviation from the exact . . . *Hirschfeld* factual predicate is warranted." We agree that the absence of the contractual obligations discussed in *Hirschfeld* is not dispositive. Still, as Lakewood acknowledges, "a contract requiring use may be *evidence of* a taxable interim use . . . ." Therefore, the absence of such a contract tends to support plaintiffs' view that they purchased the displayed furniture

primarily for resale.  *Cf. Coors*, ¶ 44 ("Although the manufacturer is contracted to manufacture beer can ends and tabs, it is not obligated to incorporate the scrap into those ends and tabs. Rather, it is free to resell the scrap [to other customers].").

  3.  Degree to Which the Furniture is Essential to Plaintiffs' Performance of Their Contractual Obligations

¶ 35  All parties seem to agree, and the district court found, that this factor does not add much to the analysis because plaintiffs did not have contractual obligations (to customers) to use, alter, or consume the displayed furniture to produce goods or perform services.  As discussed, however, the lack of pertinent contractual obligations cuts in plaintiffs' favor to some extent.

  4.  Degree to Which Plaintiffs Controlled the Manner in Which the Furniture Was Used, Altered, or Consumed Prior to Sale

¶ 36  The supreme court found this factor germane in *Hirschfeld* because Hirschfeld purchased the pre-press materials to use in performing contractual obligations to its customers and "the manner and extent of Hirschfeld's use of the items was vested solely in Hirschfeld."  806 P.2d at 923.  This factor is perhaps less relevant here, where plaintiffs had no contractual obligations to

18

use, alter, or consume the furniture to produce goods or perform services.

¶ 37    To the extent this factor remains relevant, we note that plaintiffs controlled the manner in which the furniture was displayed.  For instance, plaintiffs removed the items from the warehouses, unboxed them, assembled them into functioning furniture, and arranged them in groupings to simulate living spaces so that customers could try them out.  Plaintiffs also controlled the length of time that displayed items remained on the showroom floors.

¶ 38    On the other hand, plaintiffs' customers largely controlled their interactions with the displayed furniture.  Plaintiffs' employees sometimes encouraged customers to sit on a sofa or lie on a bed, but customers were generally free to roam around the showrooms and test the furniture as they pleased.

¶ 39    Consequently, this factor does not clearly support either plaintiffs' position or Lakewood's position.

### 5. Degree to Which Plaintiffs Altered the Form, Character, or Composition of the Furniture Prior to Sale

¶ 40    Lakewood contends that plaintiffs altered the form or composition of the displayed furniture when they assembled it for staging in the showrooms. Lakewood also argues that, after such display, the character of the furniture went "from brand new to used."

¶ 41    As discussed by the district court, however, plaintiffs' unboxing and assembly constituted merely a change in packaging of the displayed furniture, not an alteration of form, character, or composition. We find the reasoning in *Coors* instructive. The division concluded that "the process that collects the [aluminum] scrap and compresses it into briquettes is a change in *packaging*, not a change in '*form, character[,] or composition.*' . . . '[S]imply put, [the manufacturer] purchased aluminum and ultimately resold aluminum.'" *Coors*, ¶ 51 (quoting *Hirschfeld*, 806 P.2d at 921).

¶ 42    Likewise, plaintiffs purchased sofas, beds, chairs, etc. and ultimately resold sofas, beds, chairs, etc. The district court found that the furniture was well maintained and sold in "like-new

condition" on generally the same price terms as warehouse furniture. Hence, this factor also weighs in plaintiffs' favor.

¶ 43 In sum, the *Hirschfeld* factors in combination weigh decidedly in plaintiffs' favor. Under that test, then, plaintiffs' primary purpose in purchasing the displayed furniture was for resale.

### D. Returning to Lakewood's Regulations

¶ 44 Lakewood relies heavily on its special regulation pertaining to "Initial Use of Property," which states that any item purchased "for use or consumption by the purchaser" is subject to tax for that use even if the item is eventually resold in its original condition. Lakewood Sales and Use Tax Special Regs., at 41. Lakewood says that, under this regulation, whether the item shows physical signs of use is irrelevant. The item could be used extensively and then resold in its original condition, in which case the use tax would still apply.

¶ 45 That may be true, but the Initial Use regulation — by its plain terms — applies only to items purchased for the purchaser's use or consumption. As explained, plaintiffs purchased the displayed furniture primarily for resale, not for their own use or consumption; so the Initial Use regulation does not control here.

¶ 46     Nor does regulation 3.01.300(1)(b)'s explanation that the use tax applies to items "withdrawn from stock." That provision pertains to tax-free purchases for resale that are later removed from inventory "for the purchaser's own use or consumption." But plaintiffs never withdrew the displayed furniture from stock. The record reveals that the displayed furniture was always available for resale. Sometimes it was sold quickly; other times it took more than a year. But it was available for sale and always sold eventually.

¶ 47     Finally, our reading of the tax code and regulations is confirmed by Lakewood's special regulation on "Automobile Dealers and Demonstration Vehicles." Lakewood Sales and Use Tax Special Regs., at 31. A dealer's "use of an inventory or stock vehicle is not subject to a use tax if [the] vehicle is available for and in fact used for the promotion of business." *Id.* According to Lakewood, this special regulation exempts a use to which the use tax would otherwise apply. All tax regulations, however, must conform to the tax code. *See* Lakewood Mun. Code 3.01.070. Therefore, this regulation does not create an exemption from the use tax that is not intended by the tax code itself. Instead, this regulation clarifies

how the use tax exemptions of the code apply to demonstration vehicles used by dealers to promote sales. Plaintiffs' use of the displayed furniture for demonstration purposes is analogous; so, the use tax consequences should be analogous.

¶ 48　For all the reasons discussed above, the use tax does not apply to plaintiffs' purchase of the displayed furniture.[4]

IV.　Conclusion

¶ 49　The judgment is affirmed.

JUDGE J. JONES and JUDGE KAPELKE concur.

---

[4] Because Lakewood's code and regulations, considered in light of Colorado case law, are sufficient to resolve this case, we need not address the out-of-state cases cited by the parties. Besides, none of those cases brings much to the table because none involved facts very similar to those here.